**TRINITY UNIVERSAL INS. CO. v.
ROGERS et al.**

No. 13945.

Court of Civil Appeals of Texas. Dallas.

Nov. 5, 1948.

Rehearing Denied Dec. 3, 1948.

Strasburger, Price, Holland, Kelton & Miller, Hobert Price, and Royal H. Brin, Jr., all of Dallas, for appellant.

Carter, Gallagher & Barker, Charles Gallagher, and Ben T. Warder, Jr., all of Dallas, for appellees.

LOONEY, Justice.

The appellant, a corporation engaged in the insurance business, brought this suit under the Declaratory Judgments Act, Vernon's Ann.Civ.St. art. 22442—1, seeking judgment declaring that on November 12, 1945, there was not in force and effect any contract of insurance issued by it protecting N. O. Rogers against claims that might be filed against him as a result of the operation of his Ford automobile. Rogers claimed that on November 12, 1945, he had what is commonly known as a standard automobile liability insurance policy, issued by appellant, which obligated it with reference to certain claims filed against him by the occupants of a car with which he was involved in an accident on November 11, 1945. It was further alleged that the occupants of the car with which Rogers collided, filed suit against him, pending in a District Court of Dallas County; that the appellees in this cause (other than Rogers) were the occupants of the car with which Rogers collided, and are claiming to have been injured through his negligence.

Rogers, answering the present suit, asserted that he had a policy of insurance with appellant in force at the time of the accident; and the appellees, other than Rogers, also filed answers contending that appellant company did have in force and effect an automobile liability insurance policy at the time of the accident in question, same as contended by Rogers. At the conclusion of evidence, appellant's motion for an instructed verdict was overruled. Appellees' motion for an instructed verdict was likewise overruled, and the case submitted to a jury on the two issues alleging that, at the time of the accident, the policy was in effect and had never been cancelled. After overruling appellant's motion for judgment notwithstanding the jury verdict, the court proceeded to render judgment for appellees, declaring that the alleged policy of insurance was in full force and effect at the time of the accident in question; and after its motion for a new trial was overruled, appellant duly perfected this appeal.

The pivotal question upon which the appeal is predicated is presented in appellant's first point of error; that is, "The error of the trial court in overruling plaintiff's motion for an instructed verdict, since the undisputed evidence shows conclusively as a matter of law that at the time of the accident in question there was in existence no insurance policy or contract of any character under which plaintiff (appellant) owed any obligation to any of the defendants (appellees) in the cause."

Appellant's second, third and fourth points of error, by different approaches, present substantially the same question; that is, that the alleged renewal policy upon which appellees rely never became a contract under which appellant owed any obligation whatever to appellee Rogers or any of the other appellees.

The following facts are undisputed: On September 25, 1944, appellant insurance company issued its policy, effective one year, covering N. O. Rogers for public liability and property damage on a 1936 Packard automobile, which was written by the E. G. Dean Agency, representative of the appellant with authority to issue such a policy. At the time of the issuance of the policy, Rogers was employed by Schoellkopf Company, who required him to take out a policy of insurance on his personally owned car, used in his work for said company; and an employe of the company ordered the policy in question from the Dean Agency, the company paying the premium—later refunded by Rogers. There were no direct dealings between Rogers and appellant or the Dean Agency. On December 18, 1944, Rogers traded his 1936 Packard automobile for a 1941 Ford Coach, and the policy was endorsed on December 18, showing the substitution of the Ford for the Packard car. This substitution was arranged by an employe of the Schoellkopf Company with the Dean Agency, there being no direct dealings between Rogers and appellant or the Dean Agency. Rogers moved from his then residence at 7206 Tolden Street, shown on the policy in his possession, to 1128 Ferndale Street, Dallas,

but failed to notify either the appellant or Dean Agency of such change of residence. Prior to this change of street address, Rogers had left the employment of the Schoellkopf Company, and thereafter in the spring of 1945 Rogers took out a policy of insurance with the Travelers Insurance Company through its agent, a Mr. Pelster, "covering $25.00 deductible and comprehensive on said Ford car."

On August 25, 1945, before the policy expired on September 25, 1945, the Dean Agency issued appellant's policy covering Rogers as the assured on the Ford car, same being written for the period beginning September 25, 1945, and ending September 25, 1946; but after being written in final form, signed by an officer of the company and by an authorized agent, was never delivered, but retained in the office of the Dean Agency. On August 28, the Agency mailed a premium statement in the sum of $25.50 to Rogers at 7206 Tolden Street, Dallas, his address as shown in the policy; on September 28, 1945, the Dean Agency, not having received payment or hearing from Rogers, mailed a duplicate statement to him at same address, and, not hearing from this second statement and receiving no communication of any kind from Rogers, the Agency again, on October 28, mailed a duplicate statement for the amount of the premium. All these statements were mailed to Rogers at his address, properly stamped and duly deposited in the United States mail. It seems that on November 13, 1945, two days after the accident occurred, Rogers received the statement that had been mailed on October 28, 1945, indicating that a premium of $25.50 was due the Dean Agency covering the premium on the renewal policy. Rogers testified that he did not receive any other statement from the Dean Agency.

On November 11, 1945, Rogers, while driving his Ford automobile, was involved in an accident in Dallas County and, as a result, the parties named in this controversy as appellees (other than Rogers) claimed to have been injured, and filed suit against him, which suit is now pending. It seems that after receiving the premium notice as above mentioned, on November 13, 1945, Rogers had his wife call the Dean Agency and inquire as to whether or not the policy on his car was still in force. A clerk in the office answered the call, looked on the books of the Agency, found a debit entry indicating a balance payable of $25.50 for the policy in question, chargeable to N. O. Rogers, and, upon this evidence, it seems the clerk answered that the policy was in force. On the next day, November 14, a Mr. Boyd, brother-in-law of Rogers, at his request, came by the Dean Agency office, paid the cashier then in the office $25.50 and, before leaving the office, reported occurrence of the accident. Prior to this time neither appellant nor the Dean Agency had any knowledge of the accident, and no other communication of any kind took place between Rogers and either the Dean Agency or the appellant. After the payment by Boyd was made, it was discovered that the renewal policy in question had been returned to appellant company by the Agency on November 7, 1945, and after such discovery, on the same day the Dean Agency mailed to Rogers the $25.50 paid by Boyd, which was received by Rogers on November 15, 1945. Prior to November 15, 1945, the record fails to disclose that either appellant or the Dean Agency gave notice to Rogers of any cancellation of the alleged renewal policy, and it was not until after Boyd made the payment in question that either the Dean Agency or the appellant learned that Rogers had been involved in an automobile accident on November 11, 1945.

It is obvious, we think, that Rogers had no direct dealings either with appellant company or the Dean Agency until after the occurrence of the accident on November 11, 1945; prior to that date no business relations or course of dealings between Rogers and appellant company or the Dean Agency had taken place. Their only previous relation was the isolated transaction of the issuance of the original policy and the change of coverage, both brought about by the Schoellkopf Company as heretofore recited.

Doubtless a reason why Rogers did not receive the first two premium notices mailed to him by the Dean Agency, or the last one until the late date of November 13, two days after the accident, was due to the

fact that he failed to notify the Dean Agency of his change of residence and address from 7206 Tolden to 1128 Ferndale Street, Dallas; or probably the failure of Rogers to receive the notices was due to the fact that he was out of the City from July 6 until November 8, his absence spanning the entire period when the Dean Agency was attempting to contact him by the premium notices. However, we do not think it necessary to speculate as to the real reason for Mr. Rogers' apparent indifference and inattention to renewal of the policy which expired on September 25, 1945, in view of his belief that the policy would not expire until December 18, 1945. He seems to have had the idea that the policy would run one year from the date of the endorsement changing coverage of the policy from the Packard to the Ford Coach automobile, as heretofore stated. On being examined by his own attorney, Mr. Rogers was asked and answered as follows:

"Q. Do you have any reason why you didn't become concerned and start looking for this policy after it expired on the 25th of September? A. I thought my insurance was covered until December.

"Q. Why was that? A. On account of the transfer which I received was the 18th of December and I thought I was covered for one year from then on.

"Q. You thought you were covered from the 18th of December for one year from then on? A. Yes, sir."

Rogers was in possession of the policy showing its expiration date, as well as the endorsement of December 18, 1944. His idea that the policy would continue in effect for one year from December 18 was a mistake, but it was his mistake, and he alone must bear the consequences resulting therefrom, if any.

We fail to find any evidence warranting the conclusion that the minds of the parties met in an agreement on the renewal contract. There was complete absence of mutuality. Under the facts and circumstances, Rogers could not have been held liable for the premium, hence no liability was incurred by appellant under the proposed, but never consummated, renewal contract of insurance. In Pacific Nat. Fire Ins. Co. v. Suit, 201 Ark. 767, 147 S.W.2d 346, 348, the Supreme Court of Arkansas had before it a case very similar to the one involved here and, among other things, said: "According to the undisputed testimony in this record, the policy which he purchased expired on March 16, 1939, and he was notified of that fact but failed to contact the agent about paying the premium or getting time within which to pay or signifying that he would accept the renewal policy. Appellant could not have recovered the premium from him and forced the policy upon him. Not being bound himself to pay the premium, no liability rested upon the company under a renewal policy which he never indicated he wanted. A mere reservation in his own mind that he intended to pay the premium and take the policy within thirty days is not sufficient to recover on a contract which had never been accepted by him. Contracts must be mutual and a proposed contract which has not been accepted is in no sense a completed contract. It was said in the case of W. P. Harper & Co. v. Ginners Mutual Ins. Co., 6 Ga.App. 139, 64 S.E. 567, 568, that: 'The acceptance of a proposal of insurance must be evidenced by some act that binds the party accepting. A mental resolution, that can be changed, is not sufficient. Any appropriate act which accepts the terms as they were intended to be accepted, so as to bind the insurer, is sufficient to show the concurrence of the parties, the meeting of minds.' Cooley's Briefs on the Law of Insurance, 421. 'Where the proposal to insure comes from the insurer, he must be notified of the acceptance of the offer by the insured.' Id. 423, 424, 432."

In this connection attention is also called to the following authorities: The renewal of a policy is a new contract of insurance and "cannot be effected or consummated without the mutual assent of the parties; i.e., a meeting of the minds as to the essentials of the contract." Redeman v. Preferred Accident Ins. Co. of New York, 215 Wis. 321, 254 N.W. 515, 518. Any offer by the insurer to renew an insurance contract must be accepted by the insured completely and unequivocally to constitute a new contract. Metzger v. Aetna Ins. Co., 229 App.Div. 26, 240 N.Y.S.

755; City Mortgage & Discount Co. v. Palatine Ins. Co., Ltd., 226 Ala. 179, 145 So. 490; Frank v. Metropolitan Life Ins. Co., 227 Wis. 613, 277 N.W. 643, etc. It is held that where an insurance company proposes by letter to renew a policy, and the insured retains the policy but does not reply to the letter or pay the premium or indicate an acceptance until after a fire several months thereafter, there is no completed contract of insurance. W. P. Harper & Co. v. Ginners Mutual Ins. Co., 6 Ga.App. 139, 64 S.E. 567; Richmond v. Travelers' Ins. Co., 123 Tenn. 307, 130 S.W. 790, 30 L.R.A.,N.S., 954; Pennsylvania Fire Ins. Co. v. Sorrells, 23 Ga.App. 398, 98 S.E. 358. An insurance policy is a contract, and the fundamental law of contracts requires that an offer be accepted before a contract arises.

 The transactions had at the request of Rogers, between his wife, his brother-in-law and the Dean Agency, after occurrence of the accident and resultant injuries and damages, in our opinion were wholly ineffective and accomplished nothing in the way of consummating a contract of insurance. It is well settled, we think, in this State as well as the country over, that a policy issued after the loss is sustained is invalid, and under such circumstances an agent would be powerless to issue a policy or enter into an insurance contract binding upon his principal. This doctrine was clearly announced by the San Antonio Court of Civil Appeals in United States Casualty Co. v. Rodriguez, 288 S.W. 487, 488 (writ refused). The court said in part: "We agree with appellant in all of his contentions that a life policy, issued after the death of a party, or a fire insurance policy issued after the loss, is invalid. An agent has no authority to issue a policy to cover a known loss." (Citing numerous cases announcing this doctrine by our own courts as well as courts of other states.)

However, appellees in their second and fourth counter propositions contend, in substance, that the court did not err in rendering judgment in their favor because the policy issued to Mr. Rogers in renewal of his policy which expired on September 25, 1945, became effective on such date, for the reason that the evidence disclosed that it is the custom of insurance agents to renew the policies of their policy holders and, in doing so, they act as agents of the insured for the limited purpose of renewing such policies.

In regard to the renewal of the policy in question, four witnesses testified as to the course of dealing, or procedure, or custom pursued in City of Dallas, so far as their respective agencies were concerned; but the prevalence of a general custom, of which Rogers was supposed to take notice, was not shown. A Mr. Carpenter and a Mr. Carter, not connected with the Dean Agency, testified; as did Mr. Lander and Mr. Dean of the Agency.

Mr. Carpenter, examined by appellees' counsel, testified in part:

"A. Do you mean if I have a policy that was about to expire what my procedure would be?

"Q. I will ask you what your procedure is, first. A. When I have a policy coming up anywhere between 60 and 30 days prior to the expiration I will try to get in touch with the assured and find out if it is to be renewed or renew it and send him the policy and find out what he wants done with it; in other words, find out whether I am to renew it or what and if I renew it I send it to him or mail it or deliver it in person. If I know he is out of town I keep it there.

"Q. Is that method you use generally used by insurance agents? A. I am sure it is.

"Q. It is used by other agents, you know that? A. Yes sir."

Asked as to the course pursued by two other agencies (the Reinhardt and Manning Agencies), witness testified that he did not know.

Mr. Carter testified in part as follows:

"Q. In the case where a policy comes up for renewal and it is about to expire, what procedure do you follow in actual process to the renewal? A. Well, I say we pull them 60 days in advance and we go ahead and renew the ones we think are not necessary to contact the people personally and generally mail those out, a lot of those we contact personally are on the phone and

some we will renew and send out without any contact at all. In other words we assume there is no change in the insurance and we assume the people want the insurance and we mail it out to those people.

"Q. Assuming that a policy of insurance has been renewed, do you at any time hold the policy in your office? A. Yes, for various reasons why it is necessary to hold policies in the offices; the individuals may be out of the city and maybe we will want to deliver them personally or we are busy and we see them when we can and they depend on us to see the insurance is in force and they don't worry about it.

"Q. Do you do that past the renewal date? A. Yes, I have some on my desk now.

"Q. Is that the general custom of insurance agents? A. I will say that is the general custom in most of offices. It isn't a practice, but it is done in nearly every agent's office for various reasons."

On cross-examination the witness was asked and answered as follows:

"Q. You don't really know what goes on in most of the other offices in Dallas, do you? A. Yes, pretty well. I studied some insurance courses this winter with local agents in various company offices and that was one of the things we studied was procedure and the system they used.

"Q. Do you know how they handled renewals? A. No.

"Q. In T. A. Manning's office? A. No. I know how they are handled in Floyd West & Company.

"Q. What about Rhinehart's office? A. I don't know anything about that.

"Q. What about Ferguson & Ferguson? A. I don't know anything about them.

"Q. What about Walter Hill & Company? A. I don't know."

Mr. Lander, connected with the Dean Agency, was asked and answered as follows:

"Q. Mr. Lander, was that policy after it expired, was it renewed? A. Yes. We renewed it but we never did finish with Mr. Rogers, we sent him a notice.

"Q. What is the custom in your office with reference to renewing policies, Mr.

Lander, of that type? A. Well, it is hard to say just what the custom is. Different circumstances apply to different insured.

"Q. Just give the Court, not referring to this policy, just generally what do you do when you renew an insurance policy? A. When we renew a policy we issue a policy and mail it to them with a bill and send them and if they don't want it to return it or either send us the money."

Also was asked and answered:.

"Q. And you were holding that policy on your desk for him, is that right? A. We were holding it to find out whether he would come in and pay it.

"Q. The policy was there at any time that he wanted it? A. If he had come and paid for it we would have given it to him.

"Q. If he had given you a little money on it you would have probably given it to him, wouldn't you? A. I might have and I might not have. I never did see him.
* * *

"Q. And you continued to send him premium notices up to and including the latter part of October, isn't that right? A. Well, I imagine we sent him a notice along the latter part of October when we got out our November 1st bills. I would say yes we did.

"Q. And everything you did in connection with that is in the usual custom of your handling policies, isn't that correct? A. No, not the usual custom. Most of the cases we would have mailed the policy out with the bill, but I didn't know him and I was just trying to hold that business. I didn't get the business through him and I was trying to hold it and find out if he wanted it.

"Q. You wanted him to have it, didn't you? A. Sure, I wanted his business if he would pay for it."

Mr. Dean, the other partner, was asked and answered:

"Q. Mr. Dean, will you tell us your process in your office of renewing a Trinity Universal Insurance Company policy which has already been written previously? What is the mechanics of renewing that policy? A. That depends largely upon who is the customer, don't you see?

"Q. Do you know the process that was employed in renewing a Trinity Universal Insurance Company policy for an assured named N. O. Rogers? A. I do not.

"Q. Do you know whether or not such a policy was renewed? A. No, sir, I do not.

"Q. Did you ever see the policy? A. I don't believe I ever did. If I did I don't recall it. * * *

"Q. I want to know what the custom of your office is as to the date that coverage for an assured in a policy of this type takes effect, as to whether it is the date written on the policy as the inception date or when the assured actually pays the premium, and I asked you what is the intention of your agency as to coverage date of the policy. A. Well, I assume that you are asking something pertaining to the custom of our office in renewals. Mr. Lander and I act entirely separately. I mean we are partners but we have no set custom of handling renewals. I handle mine and he handles his; and I base mine on my knowledge of the man and whether or not I want to take a chance on extending him credit. In most cases, on a man I don't know, we have written a policy, say 30 days in advance which we always do, I fill out an invoice and send it to him and tell him the policy is expiring and if he will mail a check I will mail the renewal policy to him, and at the end of 30 days if he does not send a check—

"Q. At the end of 30 days you send him another bill? A. Well, I personally wouldn't have the policy in the office after that.

"Q. Assuming that you did hold it in the office and that you did send him another notice about a month after you issued the policy, now what is your custom there? A. I have no custom on a man of that type. There wouldn't be a custom except to cancel the policy if he didn't respond within 30 days.

"Q. What method of cancellation would you use? A. I would send the policy to the company for cancellation because I have mailed him an invoice and indicated that his policy had been written but it would not be held beyond 30 days. That's my way of handling it.

"Q. Is that the customary way? A. Well, it depends—if it was somebody I know, like I know your address and know your credit is good, I would probably mail the policy out direct. If it was a man I didn't know I would not permit it to become effective on the expiration of the other policy if I didn't hear from him."

■ The above, in our opinion, is a fair expose of the procedure pursued in certain agencies of the City of Dallas, but fell far short of establishing a general custom as to the renewal of policies, prevalent in the insurance business, as contended by appellees. These agents seem to have dealt with their respective customers in a certain way, depending upon acquaintance, course of dealing, or their general understanding. In the instant case there existed no course of dealing between the parties. Their only prior business relations were the isolated transactions,—the issuance of the original policy on September 25, 1944 and its endorsement December 18, 1944, transferring coverage from the Packard to the Ford automobile; both transactions were brought about not by Rogers but at the instance of Schoellkopf Company, Rogers' employer.

■ However, if it could be said that the evidence was sufficient to establish such a custom as appellees contend, yet the record fails to show that Rogers either had knowledge of such custom or relied upon it. To the contrary, his own testimony rebuts the idea that he was either relying upon custom for renewal of the policy on September 25, 1945, or even desiring or expecting its renewal, as he thought his policy would not expire until December 18, as heretofore shown.

In American Century Ins. Co. v. Hardin, 148 Ky. 246, 146 S.W. 418, the Kentucky Court of Appeals said: "The custom of insurance agents in a certain locality to keep up the insurance of their policy holders by the issuance of new policies on expiration of the old without request from the policy holders does not constitute a parol contract sufficient to support a cause of action for the recovery for a loss, but

there must be evidence independent of any custom to show that such a contract was in fact made." (Syl. 1.)

In Nippolt v. Firemen's Ins. Co. of Chicago, 57 Minn. 275, 59 N.W. 191, 192, the Supreme Court of Minnesota, among other things, said: "It is well settled that a custom, to be valid, must be uniform and certain. Lawson, Usages & Cust. §§ 9, 10. It must be compulsory, and of binding force; not optional. Id. § 11. The party to be bound by the custom must have knowledge of it. Id. § 19. The custom may be so general, long-established, and notorious that the party is presumed to have knowledge of it, and he may also, be engaged in the same line of business himself to such an extent that he may be presumed to have knowledge of its customs. But a person having no connection with the insurance business except occasionally to take out policies of insurance on his own property is not presumed to have knowledge of its customs. [Hartford Protection] Insurance Co. v. Harmer, 2 Ohio St. 452, [59 Am.Dec. 684]; Hill v. [Hibernia] Insurance Co., 10 Hun, [N.Y.], 26. It does not appear that plaintiff had any knowledge of any such custom; on the contrary, it sufficiently appears that he had not. Then, if such a custom existed, and it was valid, it would not bind the plaintiff to pay the premium for such a renewal of policy; and, unless he was himself bound by such a custom, he cannot hold the opposite party. A party having no knowledge of a custom cannot take advantage of it."

In view of the undisputed facts hereinbefore recited and the applicable authorities, we think the court below erred in rendering the judgment appealed from and refusing to render the judgment sought by appellant declaring, with reference to the accident occurring on or about November 11 or 12, 1945, made the basis of a suit filed in the 116th District Court of Dallas County, No. 98491-F, styled "James Fallis et al. v. N. O. Rogers et al.," that this appellant, Trinity Universal Insurance Company, had no policy of insurance or contract of any character in force and effect as alleged by the plaintiffs in said suit, and that appellant owes no obligation whatever to any of the appellees herein as to any matters connected with said accident or injuries and damages sustained as a result of same, and discharging appellant from any liability whatever to any of the appellees by reason of the facts alleged by them.

Therefore it is ordered that the judgment below in favor of appellees be set aside, and the judgment which in our opinion should have been entered in appellant's favor, be here rendered, and it is so ordered; and that all costs of the suit, in this and in the court below, be adjudged against appellees.

Reversed and rendered.