**COMMERCIAL UNDERWRITERS INSURANCE COMPANY**
**Plaintiff(s)**

v.

**ROYAL SURPLUS LINES INSURANCE COMPANY and Evanston Insurance Company, Defendant(s)**

No. CIV.A. H–03–2922.

United States District Court,
S.D. Texas,
Houston Division.

Oct. 29, 2004.

Philip D. Nizialek, Rathwell & Nizialek PC, The Woodlands, TX, for Plaintiff.

Jay W. Brown, Beirne Maynard & Parsons, Gary J. Siller, Strasburger & Price LLP, Houston, TX, for Defendants.

## MEMORANDUM & ORDER

HARMON, District Judge.

Pending before the Court is Defendant Royal Surplus Lines Insurance Company's motion for partial summary judgment (Doc. 24). For the reasons set forth below, the Court **ORDERS** that the motion is **GRANTED**. In addition, the Court **ORDERS** that the various pending motions seeking additional time and/or leave for filings (Docs. 26, 30 & 34) are all **GRANTED**.

## I. BACKGROUND AND RELEVANT FACTS

This is an insurance coverage dispute between an excess insurer and two primary insurers. The dispute stems from the insureds' tort liability in connection with their operation of a nursing home and the serious injuries suffered by one of their resident patients. There are four central issues presented by the pending motion:

(1) Is there any insurance coverage for the punitive damages assessed against the insureds in the underlying tort action?

(2) Can the limits of consecutive, non-overlapping primary policies be "stacked," so as to provide a greater aggregate amount of primary coverage for the insureds' tort liability?

(3) Is there coverage under the Commercial General Liability portion of Defendant Royal Surplus Lines Insurance Company's primary policies for the insureds' tortious operation of the nursing

home and the resulting injuries to the tort victim?

(4) Are Defendant Royal Surplus Lines Insurance Company's primary policies "erosion" policies, so that the policy limits are eroded by Royal's costs incurred in defending the underlying tort suit?

As discussed below, the Court concludes that the answer to the first three questions is no and the answer to the last question is yes.

The insureds in this case, whom for the sake of clarity the Court will refer to collectively as the "Nursing Home Defendants," [1] are (1) a nursing home, Heritage Geriatric Housing Development VIII, Inc. d/b/a Heritage Sam Houston Gardens ("SH Gardens"); (2) its corporate owner/manager, Heritage Housing Development, Inc. ("Heritage Housing"); and (3) its employees, including Chandra White ("White"), the Administrator of SH Gardens, Linda Ruth Williams ("Williams"), SH Gardens's Director of Nursing, and three SH Gardens nurses, Brenda Lee George ("George"), Deborah Gray ("Gray"), and John Hodnett ("Hodnett"). The tort victim was Raymond Carr, a resident patient of SH Gardens from 18 February 1999 through 01 June 2000. In the fall of 2001, Mr. Carr and his wife filed suit against the insureds in state court (the "underlying suit").[2] In August 2002, shortly after Mr. Carr's death, Mrs. Carr filed a Second Amended Petition, the operative pleading in the underlying suit. In her Second Amended Petition Mrs. Carr alleged that, "[a]t all times material, Raymond Carr was an elderly, disabled, and dependent individual, as such term is de-

---

**1.** As discussed below, there are several insurance policies in this case and not all of the Nursing Home Defendants are insureds under each of the policies.

**2.** *Velma Carr, as an Heir at Law and the Representative of the Estate of Raymond Carr,*

*Deceased vs. Health Care Holdings, L.L.C., et al.,* Cause No.2001–54025 in the 152nd Judicial District Court of Harris County, Texas. As indicated by the operative case styling, Mr. Carr died during the pendency of the lawsuit.

fined by Texas law, who occupied a certified bed in a nursing facility." [3] Furthermore, she asserted, "[t]he serious bodily injuries made the basis of this lawsuit were proximately caused by the continuing negligence and negligence per se of the named Defendants or their agents or employees acting in the course and scope of their employment." [4] Mrs. Carr also alleged that the Nursing Home Defendants' conduct constituted gross negligence, malice, and a violation of Texas's Penal Code § 22.04, "Injury to Child, Elderly or Disabled Individual." [5]

The *Carr* suit was tried to verdict and the state court entered final judgment in October 2003.[6] The Nursing Home Defendants were found liable as follows:

| DEFENDANT | ACTUAL DAMAGES | PRE–JUDGMENT INTEREST (from 5/15/01) | PUNITIVE DAMAGES | TOTAL |
|---|---|---|---|---|
| Heritage Housing Development, Inc. | $ 991,800.00 | $120,236.10 | $ 998,000.00 | $2,110,036.10 |
| Heritage Geriatric Housing Development VIII, Inc. (d/b/a Heritage Sam Houston Gardens) | $ 881,600.00 | $106,881.45 | $ 998,000.00 | $1,986,481.45 |
| Chandra White | $ 220,400.00 | $ 26,718.15 | $ 8,500.00 | $ 255,618.15 |
| Linda Ruth Williams | $ 66,120.00 | $ 8,018.10 | $ 6,000.00 | $ 80,138.10 |
| John Hodnett | $ 44,080.00 | $ 5,345.40 | $ 5,000.00 | $ 54,425.40 |
| **Subtotal Judgment** | **$2,204,000.00** | **$267,199.20** | **$2,015,500.00** | **$4,486,699.20** |
| Court Costs as of 8/5/03 | | | | $ 26,372.83[7] |
| **Total Judgment** | | | | **$4,513,072.03** |

This brings us to the parties in the present case. Defendant Royal Surplus Lines Insurance Company ("Royal") issued two primary insurance policies to named insured Heritage Geriatric Housing Development VIII (*i.e.*, SH Gardens): (1) Royal Policy # KZW200093 for the period of 14 April 1998 to 09 April 1999 (the "First Royal Policy"); and (2) Royal Policy # KZC521247 for the period of 09 April 1999 to 09 April 2000 (the "Second Royal Policy") (collectively the "Royal Policies").[8] Each Royal policy had limits of liability of $1 million and is comprised of two non-overlapping distinct coverage parts: (1) the Commercial General Liability ("CGL") Coverage Part; and (2) the Hospital Professional Liability ("HPL") Coverage Part. The listed insureds are the same under the Royal Policies, with one notable exception: Heritage Housing is not an insured under the HPL Coverage Part of the Second Royal Policy, but is only an insured under the CGL Coverage Part of that policy. It is, however, an insured under both coverage parts of the First Royal Policy.

Defendant Evanston Insurance Company ("Evanston") issued primary policy

3. *Second Amended Petition* ¶ 21. Mrs. Carr's *Second Amended Petition* is attached as Ex. 7 to Doc. 37.

4. *Id.* at ¶ 28.

5. *Id.* at ¶¶ 41–44.

6. *See* Doc. 37 Ex. 2.

7. A percentage of the total court costs was assessed against each defendant.

8. The Royal Policies are attached as Exhibits 3 and 4 to Doc. 24.

\# SM806284 to the same insureds for one policy year, April 9, 2000 to April 9, 2001 (the "Evanston Policy").[9] It provided $500,000 in primary coverage.

Plaintiff Commercial Underwriters Insurance Company ("CUIC") issued two excess insurance policies to named insured Heritage Geriatric Housing Development VIII (*i.e.*, SH Gardens): (1) CUIC Policy \# CEL015843 for the period of 30 April 1998 to 09 April 1999 (the "First CUIC Excess Policy"); and (2) CUIC Policy \# CEL016732 for the period of 09 April 1999 to 09 April 2000 (the "Second CUIC Excess Policy") (collectively the "CUIC Excess Policies").[10] Each of the CUIC Excess Policies provides coverage to the same insureds and each has a $5 million limit of liability.

The following chart summarizes the status of each of the Nursing Home Defendants as insureds on the insurance policies that are the focus of the present motion:

| DEFENDANT IN THE UUNDERLYING SUIT | FIRST ROYAL POLICY | | FIRST CUIC EXCESS POLICY | | SECOND ROYAL POLICY | | SECOND CUIC EXCESS POLICY | |
|---|---|---|---|---|---|---|---|---|
| Coverage Part | CGL | HPL | CGL | HPL | CGL | HPL | CGL | HPL |
| Heritage Housing Development, Inc. | Y | Y | Y | Y | Y | N | Y | N |
| Heritage Geriatric Housing Development VIII, Inc. (*i.e.*, SH Gardens) | Y | Y | Y | Y | Y | Y | Y | Y |
| Chandra White | N | Y | N | Y | N | Y | N | Y |
| Linda Ruth Williams | N | Y | N | Y | N | Y | N | Y |
| John Hodnett | N | Y | N | Y | N | Y | N | Y |

Royal has paid and is currently paying[11] fees and costs incurred in the defense of the Nursing Home Defendants. Shortly before the trial of the underlying lawsuit, Royal's counsel notified CUIC of a $5.4 million settlement demand by Mrs. Carr. In the face of that settlement demand, later lowered by mediation to roughly $4.4 million, Royal and Evanston informed CUIC that they would consider contributing only $1 million of the settlement funds needed to resolve the *Carr* lawsuit. CUIC asserts that Royal's defense counsel "demanded that CUIC settle the Carr lawsuit by payment of the sums over the Royal and Evanston contribution."[12]

CUIC rejected this demand. Instead, in a letter dated 20 June 2003, CUIC stated its belief that its duty as an excess carrier had not been triggered because, under the facts developed in the *Carr* lawsuit, coverage had been triggered under each separate coverage part of both Royal Primary Policies and under each separate coverage part of the Evanston Primary Policy.[13] Accordingly, in CUIC's view, the separate limits of liability applicable to each coverage part of the two Royal Primary Policies (4 × $1,000,000) and each coverage part of

---

**9.** The Evanston Policy is attached as Exhibit 12 to Doc. 24.

**10.** The CUIC Excess Policies are attached as Exhibits 5 and 6 to Doc. 24.

**11.** The *Carr* lawsuit is now on appeal as Case No. 01–04–00096–CV in the First Court of Appeals, Houston, Texas.

**12.** *First Amended Complaint* (Doc. 31) ¶ 25.

**13.** *Id.* ¶ 26.

the Evanston Primary Policy (2 × $500,000) were placed at risk by Mrs. Carr's settlement demand. CUIC therefore requested that Royal and Evanston resolve all issues in the *Carr* lawsuit through settlement, which they refused to do.

CUIC filed suit against Royal and Evanston in state court on 03 July 2003, seeking declaratory relief. On 29 July 2003 Royal timely removed the case, asserting this Court's federal diversity jurisdiction.[14] Royal has moved for partial summary judgment, asking the Court to find the following as a matter of law:

1. There is no coverage under any Royal policy for punitive damages assessed against any of the insureds in the underlying lawsuit.

2. The limits of the primary policies at issue in this lawsuit cannot be stacked. Thus, CUIC's obligations are triggered after the limits of *one* primary policy period have been exhausted.

3. There is no coverage under the CGL portion of any Royal primary policy.

4. The limits of any applicable Royal primary policy are eroded by "Supplementary Payments," which include fees and costs incurred in the defense of the Nursing Home Defendants, prejudgment interest, and post-judgment interest.

Evanston has joined in Royal's stacking argument and CUIC has responded. Royal's motion is thus ripe for ruling.

## II. LEGAL STANDARD

The movant seeking a federal summary judgment initially must inform the court of the basis for his motion and point out those portions of the pleadings, depositions, answers to interrogatories, and admissions on file that demonstrate the absence of a genuine issue of material fact and show that he is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant need not negate the opposing party's claims nor produce evidence showing an absence of a genuine factual issue, but may rely on the absence of evidence to support essential elements of opposing party's claims. *International Assoc. of Machinists & Aerospace Workers, Lodge No. 2504 v. Intercontinental Mfg. Co.,* 812 F.2d 219, 222 (5th Cir.1987). The burden then shifts to the non-movant to set forth specific facts and competent summary judgment evidence to raise a genuine issue of material fact on each essential element of any claim on which he bears the burden of proof at trial. Fed.R.Civ.P. 56(c). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party may not rest on mere allegations or denials in its pleadings, but must produce affirmative evidence and specific facts. *Anderson,* 477 U.S. at 256–57, 106 S.Ct. 2505. He meets this burden only if he shows that "a reasonable jury could return a verdict for the non-moving party." *Id.* at 254, 106 S.Ct. 2505. A mere scintilla of evidence will not preclude granting of a motion for summary judgment. *Id.* at 252, 106 S.Ct. 2505.

All reasonable inferences must be drawn in favor of the non-moving party. *Matsushita Electric Industrial Co., Ltd. v. Ze-*

---

**14.** CUIC is a California insurer with is principal place of business in California. Royal is a Connecticut entity with its principal place of business in Georgia and Evanston is an Illinois entity with its principal place of business in Illinois.

*nith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), citing *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Once the burden of proof has shifted to the non-movant, he "must do more that simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. Instead he must produce evidence upon which a jury could reasonably base a verdict in his favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.,* 477 U.S. at 249–50, 106 S.Ct. 2505. Moreover the non-movant must "go beyond the pleadings and by her own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.,* 139 F.3d 532, 536 (5th Cir.1998). Unsubstantiated and subjective beliefs and conclusory allegations and opinions are not competent summary judgment evidence. *Grimes v. Texas Dept. of Mental Health and Mental Retardation,* 102 F.3d 137, 139–40 (5th Cir.1996); *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994); *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.), *cert. denied,* 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). Nor are pleadings summary judgment evidence. *Wallace v. Texas Tech University,* 80 F.3d 1042, 1046 (5th Cir.1996), *citing Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994)(*en banc* ). The non-movant cannot discharge his burden by offering vague allegations and legal conclusions. *Salas v. Carpenter,* 980 F.2d 299, 305 (5th Cir. 1992); *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Nor is the district court required by Rule 56 to sift through the record in search of evidence to support a party's opposition to summary judgment. *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998), *citing Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915–16 & n. 7 (5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992).

## III. ANALYSIS

After reviewing the terms of the Royal policies, the circumstances surrounding the underlying suit, and the applicable law, the Court concludes that Royal's motion should be granted in all respects. The Court agrees with Royal that there is no coverage under the CGL portion of any Royal primary policy in this case. Consequently, there is no coverage under either Royal policy for punitive damages assessed against any of the insureds in the underlying lawsuit. Furthermore, as a matter of Texas law, the limits of the primary policies at issue in this lawsuit cannot be stacked. Thus, CUIC's obligations are triggered after the limits of *one* primary policy period have been exhausted. Finally, the Court finds that the limits of the Royal policies are eroded by "Supplementary Payments," which include the fees and costs incurred in the defense of the Nursing Home Defendants, prejudgment interest, and post-judgment interest.

### A. Choice of Law

CUIC contends, without providing any supporting legal analysis, that California law should apply to at least some aspects of the Royal Policies. The Court concludes that a proper choice of law analysis leads to the conclusion that, on the contrary, Texas law governs all relevant aspects of the policies at issue in this case.

■ A federal court sitting in diversity cases must apply the choice of law rules of the state in which it sits.[15] Therefore, this Court must apply Texas choice of law rules. In general, there are three steps a court in Texas must apply for determining choice of law in the context of a contract dispute. First, a court must determine if there is a valid choice of law provision in the contract.[16] If there is such a valid provision, it will apply. If there is not such a provision in the contract, then Texas follows the RESTATEMENT (SECOND) OF CONFLICT OF LAWS ("RESTATEMENT"), section 6.[17] Here, the Royal Policies do not contain a choice of law provision. Accordingly, the Court must follow the RESTATEMENT.

Section 6 of the RESTATEMENT directs a court to first follow the statutory directives of its own state on choice of law. In this case, there is a statutory directive that must be considered: Article 21.42 of the Texas Insurance Code, entitled "Texas Law Governs Policies." Consequently, a court in Texas must evaluate whether an insurance contract meets the requirements of Article 21.42. If it does, the contract is subject to Texas law. If the insurance contract does not meet the requirements of Article 21.42, then a court is to apply the "most significant relationship" test of the RESTATEMENT, Section 6, to determine which state's law should control the dispute.

### (1) Article 21.42 of the Texas Insurance Code

■ Article 21.42 provides as follows:

Any contract of insurance **payable to any citizen or inhabitant of this State** by any insurance company or corporation **doing business within this State** shall be held to be a **contract made and entered into under and by virtue of the laws of this State** relating to insurance, and governed thereby, notwithstanding such policy or contract of insurance may provide that the contract was executed and the premiums and policy (in case it becomes a demand) should be payable without this State, or at the home office of the company or corporation issuing the same.

There is no dispute that SH Gardens was a "citizen or inhabitant" of Texas and that the Royal policies were contracts of insurance payable to SH Gardens by an "insurance company ... doing business within" Texas. Heritage Geriatric Housing Development VIII, Inc. d/b/a Sam Houston Gardens (i.e., SH Gardens) is the first named insured on both Royal Policies.[18] The

---

**15.** *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1413 (5th Cir.), *cert. denied*, 516 U.S. 865, 116 S.Ct. 180, 133 L.Ed.2d 119 (1995).

**16.** *De Aguilar*, 47 F.3d at 1413.

**17.** *See DeSantis v. Wackenhut*, 793 S.W.2d 670, 679 (Tex.1990), *cert. denied*, 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991). Section 6 of the RESTATEMENT provides as follows:
   (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
   (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

**18.** *See* First Royal Policy, Endorsement No. 9, and Second Royal Policy, at Doc. 37 Exs. 3 & 4.

physical address of this entity is listed in both Royal Policies as "1615 Hillendahl Road, Houston, Texas 77055." [19] Although both Royal Policies list the mailing address for SH Gardens as being "in the care of The Heritage Companies, 16133 Ventura Blvd., # 965, Encino, CA 91436," there is no dispute that its physical location is in Houston, Texas. Thus, SH Gardens is an inhabitant of Texas under Article 21.42, and Texas law applies to the contract of insurance between SH Gardens and Royal.

Likewise, there is no dispute that the three individual SH Garden employees found liable in the underlying suit, Chandra White, Linda Ruth Williams, and John Hodnett (collectively the "Individual Defendants"), are Texas citizens. Accordingly, the Individual Defendants are inhabitants of Texas under Article 21.42, and Texas law likewise applies to their coverage issues.

The final Nursing Home Defendant is Heritage Housing. Heritage Housing is a California corporation. and Royal does not attempt to argue that this entity is an inhabitant of Texas under Article 21.42. Instead, Royal argues that under the RESTATEMENT's "most significant relationship" test Texas law should also apply to Heritage Housing's coverage.

### (2) The Most Significant Relationship Test

Under the "most significant relationship" test, if the claim sounds in contract, such as an insurance contract dispute, Texas courts apply the test set forth in section 188 of the RESTATEMENT.[20] Section 188(1) provides that "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in section 6." [21] Section 188(2) states the following:

> In the absence of an effective choice of law by the parties ..., the contacts to be taken into account in applying the principles of section 6 to determine the law applicable to an issue include:
>
> (a) the place of contracting,
>
> (b) the place of negotiation of the contract,
>
> (c) the place of performance,
>
> (d) the location of the subject matter of the contract, and
>
> (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.[22]

In the present case the third and fourth factors are particularly important and are ultimately determinative on the choice of law issue. The comments to the RESTATEMENT state the following with respect to contracts affording protection against risk:

> When the contract deals with a specific physical thing ... or affords protection against localized risk ... the location of the thing or of the risk is significant .... The state where the thing or the risk is located will have a natural interest in transactions affecting it. Also the parties will regard the location of the

---

19. Doc. 37 Exs. 9 & 10.

20. *Minnesota Mining & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 735 (Tex.1997); *Philadelphia Am. Life Ins. v. Turner*, 131 S.W.3d 576, 593 (Tex.App.—Fort Worth 2004, Mar. 4, 2004).

21. *Restatement* § 188(1).

22. *Id.* at § 188(2).

thing or of the risk as important. Indeed, when the thing or the risk is the principal subject of the contract, it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the thing or risk was located would be applied to determine many of the issues arising under the contract.[23]

As noted above, SH Gardens is located in Texas. Moreover, Heritage Housing was added to the Royal Policies as an additional insured only with respect to the operations of the named insured, *i.e.* SH Gardens.[24] Similarly, section 193, which applies specifically to insurance contracts,[25] provides that the state with the most significant relationship is usually the state where the insured risk is located:

> The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.[26]

Thus, CUIC's contention that California law should apply in this case because Royal's policies were "issued in California to a California corporation with holdings in California and several other states" is without merit. Even with respect to Heritage Holdings, the location of the relevant risk is clearly Texas and the Court finds that Texas law should apply.

## B. Lack of CGL Coverage

■ The CGL Coverage Part of the Royal Policies limits coverage for "bodily injury" to bodily injury caused by an "occurrence."[27] An "occurrence" is defined in the policies as "an *accident,* including continuous or repeated exposure to substantially the same general harmful conditions."[28] Furthermore, coverage is excluded under the CGL Coverage Part of the Royal Policies for " '[b]odily injury' ... expected or intended from the standpoint of the insured."[29] The Court finds that the basis for the Nursing Home Defendants'[30] liability does not satisfy the Royal Policies' definition of "occurrence," since the jury in the underlying suit did not hold them liable because of an "accident," but rather found that Mr. Carr's injuries were the result of malice. In addition, the jury's finding of malice, which was necessary to support the punitive damages award, triggers the exclusion for "expected or intended" bodily injury.

---

**23.** *Id.* at § 188 cmt. e.

**24.** See First Royal Policy, Endorsement No. 15; Second Royal Policy, "Additional Insured—Designated Person or Organization" Endorsement.

**25.** *Restatement* § 193 cmt. a.

**26.** *Id.* § 193.

**27.** *See* the Royal Policies, Form CG 00 01 0196, § 1 ¶ 1(b)(1).

**28.** *Id.* at § V ¶ 12 (emphasis added).

**29.** *Id.* at § I.A ¶ 2(a).

**30.** Royal asserted in its motion for partial summary judgment that the Individual Defendants–White, Williams, and Hodnett–were "not insured under the CGL Coverage Part of the Royal Policies" and that it believed "this fact is uncontested." Doc. 24 at 14 n. 15. In its two responses to Royal's motion CUIC appeared to concede this point. Nevertheless, the Court's reasoning with respect to the CGL Coverage Part of the Royal Policies applies equally to all of the Nursing Home Defendants, and for the sake of simplicity the Court refers to them all.

In general, the duty to indemnify is triggered by the actual facts establishing liability in the underlying suit.[31] Here, the jury explicitly found by clear and convincing evidence "that the harm suffered by Raymond Carr resulted from malice" on the part of all the Nursing Home Defendants.[32] In the question submitted to the jury, "malice" was defined as:

(a) a specific intent by the Defendant(s) to cause substantial injury to Raymond Carr; or

(b) an act or omission by the Defendant(s):

  (i) which when viewed objectively from the standpoint of the Defendant(s) at the time of the occurrence involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

  (ii) of which the Defendant(s) had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.[33]

Given this definition, the jury's finding of "malice" negates CGL coverage on two levels, as noted above. First, the finding of malice removes the conduct from the gambit of an "occurrence." Second, it triggers the policies' "expected or intended exclusion."

Under Texas law, "when the insured's acts are voluntary and intentional, the results or injuries, even if unexpected, are not caused by an 'accident,' and therefore, the event is not an 'occurrence' under the policy."[34] For example, in *Wessinger v. Fire Insurance Exchange*, the insured got drunk and punched a man named Morrison, causing Morrison permanent vision loss.[35] In an attempt to argue there was insurance coverage for his conduct, the insured contended he did not intend to injure the man and did not even remember hitting him. However, the court noted that the insured voluntarily imbibed alcohol. The court concluded that "voluntary intoxication does not destroy the volitional and intentional nature of" the insured's conduct and the injuries to Morrison naturally resulted from such conduct.[36] Therefore, the conduct was not accidental and not a policy "occurrence."[37]

The court offered the following two-step process for determining whether an act or event is an "accident."[38] The first step is to identify the specific acts alleged to be the cause of the plaintiff's damages and whether such acts were "voluntary and intentional."[39] If the acts were involuntary and unintentional, then the analysis ends and the results would be considered accidental and a policy "occurrence." If the acts were voluntary and intentional, then it must be determined whether the injuries were the natural results of such acts:

31. *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co.*, 99 F.3d 695, 701 (5th Cir.1996); *Malone v. Scottsdale Ins. Co.*, 147 F.Supp.2d 623, 629 (S.D.Tex.2001).

32. *Charge of the Court* (Doc. 37 Ex. 1) at 8.

33. *Id.*

34. *State Farm Lloyds v. Kessler*, 932 S.W.2d 732, 738 (Tex.App.—Fort Worth 1996, writ denied).

35. 949 S.W.2d 834, 835 (Tex.App.-Dallas 1997, no writ).

36. *Id.*

37. *Id.*

38. *Id.* at 837.

39. *Id.*

When a result is not the natural and probable consequence of an act or course of action, it is produced by accidental means. The natural result of an act is the result that ordinarily follows, may be reasonably anticipated, and ought to be expected. This standard is objective. A person is held to intend the natural and probable results of his acts even if he did not subjectively intend or anticipate those consequences.[40]

Stating that the insured's subjective intent was irrelevant, the court concluded that the conduct at issue was voluntary, intentional, and not a policy "occurrence" because it was not an accident.[41] "Simply because the degree of injury suffered may have been great does not make the specific type of injury alleged any less a natural result of the act."[42] Neither the degree nor the foreseeability of the injury are part of the test.[43]

▇ In contrast, when determining the applicability of the intentional acts exclusion, the appropriate focus is the insured's intent to cause the injury.[44] The exclusion applies to intentionally caused injuries, not to intentional acts.[45] However, "[i]ntent to injure may be inferred when the character of the act done is such that the degree of certainty that the conduct will cause injury is sufficiently great to justify an inference as a matter of law that the actor intended to cause injury. The more likely that harm will result from the conduct, the more likely it is that intent to harm may

be inferred as a matter of law."[46] If a bodily injury would not result but for the intentional conduct of the insureds, claims of negligence and gross negligence emanating from the same conduct are excluded.[47]

Applying the *Wessinger* two-step process to the present situation leads to the conclusion that the Royal Policies' "occurrence" definition has not been satisfied. The jury's finding of malice eliminates coverage under the CGL Coverage Part of the Royal Policies. The conduct for which the Nursing Home Defendants were held liable was voluntary and intentional. The injuries to Mr. Carr were the natural results of that conduct. The conduct at issue was not an "accident." The jury found that the Nursing Home Defendants specifically intended to injure Mr. Carr or had "actual subject awareness of the risk involved" in following their chosen course of conduct. Thus, based upon the malice finding against each of the Nursing Home Defendants in the underlying suit, the Royal Policy's "occurrence" definition in the CGL Coverage Part cannot be satisfied. Furthermore, the exclusion for bodily injury "expected or intended from the standpoint of the insured" forms a second, independent basis for the lack of coverage under the CGL Coverage Part of the Royal Policies.

CUIC's insouciant response to Royal's arguments on the CGL coverage issue does nothing in its favor. CUIC actually

---

40. *Id.*

41. *Id.* at 838.

42. *Id.* at 841.

43. *Id.*

44. *In re Pierce Mortuary Colleges, Inc.*, 212 B.R. 549, 559 (Bankr.N.D.Tex.1997); *State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 377 n. 2 (Tex.1993).

45. *S.S.*, 858 S.W.2d at 377 n. 2.

46. *State Farm Fire & Cas. Co. v. Gandy*, 880 S.W.2d 129, 139–40 (Tex.App.—Texarkana 1994), *rev'd on other grounds*, 925 S.W.2d 696 (Tex.1996).

47. *In re Pierce Mortuary Colleges, Inc.*, 212 B.R. at 560.

filed two responses[48] to Royal's motion for partial summary judgment, telling the Court in its first response that it needed "a further opportunity to examine the underlying record and supplement its response."[49] In its first response CUIC actually stated that it "does not necessarily disagree with Royal's argument that under Texas law . . . malicious events cannot be 'occurrences.'"[50] However, CUIC suggested that perhaps "the jury awarded punitive damages based on *some* acts or omissions, while *other* acts or omissions did not amount to 'malicious' acts or omissions."[51] "At the very least," CUIC contended, "Royal's motion cannot be granted on this point until CUIC has a further opportunity to examine the underlying record and supplement its response."[52]

Three and half months after filing its initial response CUIC, having had its further opportunity to examine the underlying record, filed its "Full and Complete Response."[53] CUIC's "full and complete" response to Royal's CGL coverage arguments is nearly identical to its initial response. Indeed, the passages-both approximately one page in length-appear to be entirely identical, with one exception: CUIC deleted the sentence urging this Court not to grant Royal's motion until CUIC has "further opportunity" to examine the record. Thus, CUIC *still* "does not necessarily disagree with Royal's argument that under Texas law . . . malicious events cannot be 'occurrences.'"[54] For its part, as discussed above, this Court affirmatively agrees with Royal's argument, at least as applied to the facts of this case. The jury's findings in the *Carr* lawsuit and the terms of the Royal policies conclusively establish that there is no coverage under the CGL portion of either of the Royal policies.

## C. No Coverage for Punitive Damages

■ There appears to be no real dispute between the parties on the coverage for punitive damages issue: Royal argues that there is no coverage under any of its policies for the punitive damages assessed in the Carr lawsuit, and CUIC likewise takes the position-though CUIC applies California law-that there is "no coverage available for punitive damages under *any* of the insurance policies."[55] Furthermore, the Court finds that under Texas law the Royal policies could not include coverage for exemplary damages that might be assessed against SH Gardens or its employees. At the time the Royal Policies were issued (1998 and 1999) and currently, Article 5.15–1, Section 8, of the Texas Insurance Code provided that medical professional liability insurance policies could not include coverage for exemplary damages that might be assessed against a not-for-profit nursing home and its employees unless the policy contained a special endorsement approved by the Texas Insurance Commissioner. There is no dispute that SH Gardens was at all relevant times a not-for-profit nursing home. Nor is there any dispute that the Royal Policies do not contain the required endorsement to permit insurability of punitive damages. Therefore, the policies do not cover punitive damages assessed against the Nursing Home Defendants.

---

**48.** Docs. 27 & 46.

**49.** Doc. 27 at 14.

**50.** *Id.* at 13.

**51.** *Id.* at 14 (emphasis in original).

**52.** *Id.*

**53.** Doc. 46.

**54.** *Id.* at 20.

**55.** Doc. 46 at 10 (emphasis in original).

## D. Impermissibility of Stacking the Policy Limits of Consecutive, Non–Overlapping Primary Insurance Policies

■ Relying primarily on *American Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842 (Tex.1994), both Royal and Evanston maintain that "when an incident triggers multiple policy years, the limits of each consecutive policy cannot be stacked to determine the amount of insurance coverage available to an insured."[56] CUIC agrees that under Texas law *Garcia* governs the stacking issue. CUIC, however, argues that the "*Garcia* rule" applies only to "a single claim involving indivisible injury."[57] After reviewing the record, the Court finds that the injuries suffered by Mr. Carr arose from "related medical incidents" and "related acts, errors, omissions, or occurrences" as those terms are used in the Royal and Evanston policies, respectively. Accordingly, the Court concludes that, pursuant to the terms of the insurance contracts and the governing construction of those terms under Texas law, the limits of the primary policies in this case cannot be stacked.

### (1) American Physicians Ins. Exch. v. Garcia

The insurance dispute in *Garcia* stemmed from a medical malpractice action. The plaintiff widow in that case alleged that her husband had suffered adverse side effects from drugs the insured physician prescribed "during the course of several office visits from September 1980 to February or March 1983."[58] During that time period, the physician (Garcia) was covered by four consecutive non-overlapping policies. In 1980, Garcia was covered by an Insurance Corporation of America ("ICA") "claims-made" medical malpractice insurance policy with limits of $100,000. In 1981 and 1982, Garcia was covered under two consecutive one-year ICA "occurrence" policies, each providing him with $500,000 in coverage. Finally, in 1983, Garcia purchased an occurrence policy from petitioner American Physicians Insurance Exchange ("APIE") with a $500,000 limit per occurrence.

ICA and APIE both participated in the defense of the medical malpractice action. The lowest settlement demand made by the plaintiff widow was $600,000, which was not accepted. The malpractice action was ultimately tried to the court, which found that "Garcia's course of treatment constituted continuing negligence beginning September 1980 and ending February 1983, and rendered judgment for $2,235,483.30 plus costs and interest." Acting as Garcia's assignees, the malpractice plaintiffs subsequently sued the insurers, alleging that they had violated their duty to defend Garcia and their *Stowers* duty to accept a reasonable settlement demand within policy limits.[59] After ICA settled, the *Stowers* suit against APIE was tried to a jury, which found for the plaintiffs, awarding $2,235,000 in compensatory damages (*i.e.*, the amount of the judgment in the malpractice suit) and $500,000 in exemplary and additional damages. The trial court entered judgment and the court of appeals modified and affirmed.

---

**56.** *Royal's Motion for Partial Summary Judgment* (Doc. 24) at 12; *Evanston's Notice of Intention to Join and Adopt Royal's Motion for Partial Summary Judgment* (Doc. 25) ¶ 1.

**57.** *CUIC's Full and Complete Response* (Doc. 46) at 14 (quoting *Garcia*, 876 S.W.2d at 853).

**58.** *Garcia*, 876 S.W.2d at 845.

**59.** The duty of an insurer to exercise ordinary care in the settlement of claims to protect its insureds against judgments in excess of policy limits is generically referred to in Texas as the *Stowers* duty. *Stowers Furniture Co. v. American Indem. Co.*, 15 S.W.2d 544 (Tex.Comm'n App.1929, holding approved).

The Texas Supreme Court reversed. The Court noted that "APIE had an opportunity to settle within the limit of Garcia's coverage only if it was mistaken in its contention that the multiple policies could not be stacked." [60] The Court, however, concluded that "[t]he consecutive policies, covering distinct policy periods, could not be 'stacked' to multiply coverage for a single claim involving indivisible injury." [61] In the Court's view, "[s]imply because a 'Claim Occurrence' extends throughout several policy periods does not raise the per-occurrence indemnity cap established in every policy." [62] Furthermore, in considering the meaning of "occurrence" in standard commercial policies generally and under the APIE policy in particular, the Court specifically noted that a "malpractice event may involve numerous independent grounds of negligence that . . . constitute 'a series of acts or occurrences' that are related and form a single malpractice claim." [63]

### (2) "Medical Incidents" Under the Royal Policies and "Occurrences" and "Claims" Under the Evanston Policy

The HPL part of the Royal Policies defines a "medical incident" as "any act or omission: a. In the providing of or failure to provide professional health care services to your patients . . . ." [64] The Royal Policies further state that "[a]ll related 'medical incidents' arising out of the providing of or failure to provide professional health care services to any one person shall be considered one 'medical incident.' " [65] Similarly, the Evanston Policy defines "occurrence," which is applicable to both its HPL and CGL coverage parts, [66] as "an accident, including continuous or repeated exposure to conditions, which results in personal injury or property damage neither expected nor intended from the standpoint of the Insured, arising out of the Named Insured's business as a hospital or nursing home." [67] Furthermore, the Evanston policy provides that "[t]wo or more claims arising out of a single act, error omission or occurrence or a series of related acts, errors, omissions, or occurrence[s] shall be treated as a single claim." [68] Accordingly, if Mr. Carr's injuries were the result of (1) "related medical incidents" under the Royal Polices and (2) a single "occurrence" or a series of "related occurrences" under the Evanston Policy, then this case falls within the holding of *Garcia* and the policies cannot be stacked.

The only party to come forward with a proposed definition of the word "related"

---

60. *Garcia,* 876 S.W.2d at 849.

61. *Id.* at 853.

62. *Id.* at 853–54.

63. *Id.* at 854 n. 21. Although the Court has ruled that Texas law applies to this action, it is worth noting that it appears that the same anti-stacking rule would apply under California law. *See FMC Corp. v. Plaisted and Companies,* 61 Cal.App.4th 1132, 72 Cal.Rptr.2d 467 (1998).

64. Royal Policies, HPL Coverage, Section V—Definitions, 8. As the Court concluded above, the CGL parts of the Royal Policies were not triggered in this case.

65. Royal Policies, Form PR 00 03 12 97, § III ¶ 3.

66. The Evanston Policy explicitly provides that its CGL coverage part cannot apply to "personal injury . . . arising out of the rendering of or failure to render any professional services." Doc. 45 Ex. 2 at p. 5. Accordingly, only the HPL coverage part of the Evanston Policy is at issue here.

67. Doc. 45 Ex. 2 at p. 2.

68. *Id.* at 5.

is Royal. Royal urges this Court to adopt the definition of "related" adopted by the court in *Columbia Casualty Company v. CP National, Inc.,* —— S.W.3d ——, 2004 WL 2066247 (Tex.App.-Houston (1st Dist.), pet. denied), a recent Texas appellate opinion involving a medical malpractice insurance policy. The Court in *Columbia Casualty* noted that the "question of defining 'related' in a medical malpractice insurance policy appears to be one of first impression for Texas." [69] Citing *Garcia,* the appellate court noted that "although a malpractice event may involve numerous independent grounds of negligence that constitute a series of acts, Texas law indicates that they can still be related and form a single malpractice claim." [70] "Thus," the court concluded, "giving the term 'related' its ordinary and generally accepted meaning, we conclude that 'related' means having a logical or causal connection." [71]

This Court adopts Royal's proposed definition of "related," and concludes that the *Columbia Casualty* court's definition can be appropriately applied to hospital professional liability insurance policies, such as those in the case at bar. Accordingly, the Court construes "related" to mean "having a logical or causal connection." Given this definition, which the Court believes is not significantly different from other defini-

tions that might have applied,[72] the Court finds that the events giving rise to Mr. Carr's injuries were *related* "medical incidents" and *related* "occurrences" under the Royal and Evanston policies. Specifically, the Court concludes that the injury-causing events have both logical and causal connections.

### (3) The Facts of the Underlying Suit

Royal argues that it is unnecessary for this Court to review the trial transcript in the underlying suit. Rather, Royal takes the position that the "duty to indemnify is based on the jury's *findings,*" and that this Court therefore need only look to the state court petition and to the jury charge and the jurors' responses therein.[73] Although this Court agrees that, in many cases, a court need only look to the jury's findings to determine an insurer's duty to indemnify,[74] and not need pour over voluminous trial records, the Court will examine both the pleadings and the trial record in the underlying suit. The Court concludes that both sources establish that Mr. Carr's injuries were caused by *related* "medical incidents" and *related* "occurrences" under the Royal and Evanston policies.

The operative pleading in the underlying suit alleged that "[t]he serious bodily inju-

**69.** —— S.W.3d at ——, 2004 WL 2066247 at *6.

**70.** *Id.* at —— S.W.3d at ——, 2004 WL 2066247 at *7 (citing *Garcia,* 876 S.W.2d at 853 n. 21).

**71.** *Id.* (citing MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY 1050 (11th ed.2003)).

**72.** As noted above, CUIC failed to propose its own definition of "related."

**73.** *Royal's Reply* (Doc. 51) at 4 (emphasis added).

**74.** *See Westport Ins. Corp. v. Atchley, Russell, Waldrop & Hlavinka, L.L.P.,* 267 F.Supp.2d

601, 625 (E.D.Tex.2003) (noting that under Texas law "the duty to indemnify is based on the jury's findings") (citing *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.,* 106 S.W.3d 118, 127–28 (Tex.App.—Houston [1st Dist.] 2002, pet. denied)); *but see Great Am. Lloyds Ins. Co. v. Mittelstadt,* 109 S.W.3d 784, 787 (Tex.App.—Fort Worth 2003, no pet.) (stating that "we only look to the facts established in the underlying litigation to determine if a duty to indemnify exists" but also that, in doing so, "we review the record from the underlying suit, which includes the pleadings, the trial transcript, the insurance policy, and the judgment.").

ries made the basis of this lawsuit were proximately caused by the *continuing negligence* and negligence per se of the named Defendants or their agents or employees acting in the course and scope of their employment." [75] Furthermore, Mrs. Carr alleged that the Nursing Home Defendants "engag[ed] in a pattern and practice of ongoing neglect and conduct," and that her husband's injuries were caused by "Defendants' continuing course of repeated negligence." [76] According to Mrs. Carr, the Nursing Home Defendants' conduct "was not occasional or fortuitous," but rather was instead:

> ...the natural and predictable result of the decisions made at the higher levels of Defendants' corporate structure to maximize revenues and profits while at the same time reducing costs. Defendants' policies and financial decisions caused: a) repeated dangerous staffing levels at the facility; b) patient population needs that continuously and grossly exceeded the capacity of the limited number of care givers on duty; and, c) ongoing neglect of Mr. Carr.[77]

Thus, Mrs. Carr claimed that her husband's injuries were caused by the Nursing Home Defendants' pattern of ongoing neglect, and that this pattern was itself caused by management's inordinate focus on cutting costs. Notably, she did not allege that her husband suffered discrete divisible injuries as a result of discrete divisible acts by the Nursing Home Defendants. Therefore, the plaintiff's theory in the underlying suit, a theory upon which she prevailed, was that Mr. Carr was injured by a series of acts and omissions that were *related*, having both causal con-

nections (*i.e.*, the pattern of negligence was caused by management's focus on cutting costs) and logical connections (*i.e.*, all of the relevant acts/omissions are logically connected to the concept of professional nursing home care, to which Mr. Carr was entitled).

The jury findings lead to the same conclusion. The state court's charge spoke of a single, unitary "injury" to Mr. Carr.[78] Question 1 asked the jury the following: "Did the negligence, if any, of those named below proximately cause the injury in question? Answer 'Yes' or 'No' for each of the following." [79] The jury answered 'Yes' for all Defendants. The jury then, in response to Question 2, determined the "percentage of the negligence that caused the injury in question," assigning a percentage to each Defendant.[80] Finally, the jury made findings of malice and determined amounts of damages. Based on the state court's charge and the jury's responses, then, the jury was asked to make findings with respect to a unitary *injury* (*i.e.*, and not divisible *injuries*) and it returned a verdict for the plaintiff, assigning a portion of the blame to each of the Defendants for Mr. Carr's injuries. The jury charge and the jury's responses are consistent with Royal and Evanston's position of *related* medical incidents and occurrences but are inconsistent with CUIC's position of discrete, divisible injuries that ought to trigger multiple coverage claims.

Finally, the record of the underlying trial also supports Royal and Evanston's position. CUIC attempts to characterize the Underlying Suit as involving discrete injuries—malnutrition, dehydration, pres-

---

75. *Second Amended Petition* ¶ 28 (emphasis added).

76. *Id.* ¶ 30.

77. *Id.* ¶ 31.

78. *Charge of the Court* (Doc. 37 Ex. 1) at 5–8.

79. *Id.* at 5.

80. *Id.* at 6.

sure ulcers, a separated shoulder, scabies/infection, and contractures of the limbs—as a result of discrete acts and omissions spanning the policy periods. In particular, CUIC (and Mrs. Carr in her Response to Royal's Motion) attempt to emphasize a shoulder dislocation sustained by Mr. Carr on November 4, 1999 as a discrete divisible incident. CUIC, however, has failed to marshal evidence to support its position. Instead, as Royal has demonstrated, the evidence at the underlying trial showed that it was unclear how Mr. Carr's shoulder dislocation occurred. Mrs. Carr's own medical expert, Dr. Mansfield, testified that there was nothing in the medical records to show any particular cause of the dislocation.[81] He further testified that he could not render an opinion as to whether or not the nursing home fell below the standard of care in causing the dislocation because he could not determine how it was caused.[82]

Mr. Carr's shoulder dislocation, however, was significant, not because the nursing home caused it or because it was a divisible incident, but because it was the pivotal event that led to Mr. Carr's development of pressure sores. After he sustained the dislocated shoulder, Mr. Carr deteriorated significantly because his mobility decreased dramatically, and this is what led to his development of the pressure sores.

By way of background, Suzanne Frederick, R.N., Mrs. Carr's expert, testified that Mr. Carr was admitted to Sam Houston Gardens primarily because of Alzheimer's disease.[83] She further testified that when Mr. Carr was originally admitted to the nursing home, he did not have pressure sores, he did not have skin breakdown, and he did not have contractures where his joints would not move.[84]

However, after he sustained the dislocated shoulder, Mr. Carr's mobility decreased dramatically; this was a significant event in his nursing home stay.[85] Dr. Mansfield explained that pressure sores develop because of pressure, and the way to get rid of the pressure is to move periodically from one location of the body to another as that distributes the pressure evenly so the skin does not break down.[86] Dr. Mansfield testified that before the shoulder dislocation, Mr. Carr was mobile in bed and able to move himself around.[87] For instance, Mr. Carr would throw off his bed sheets, he would roll himself to the side of the bed and urinate on the floor when the staff would not come to get him to the urinal, and he would remove his dirty diapers and throw them out.[88]

Mrs. Carr also testified that, prior to Mr. Carr's dislocated shoulder, Mr. Carr could feed himself and turn himself, and that he still had mobility.[89] Nurse Frederick similarly testified that prior to his shoulder dislocation Mr. Carr was capable of turning and repositioning himself and therefore was able to relieve the pressure off his bony prominences, and that he was actually very mobile.[90] She further testi-

---

81. Doc. 51 Ex. C, Trial Transcript, Vol. 8, p. 60 line 18 to p. 61 line 9.

82. *Id.* at p. 62 lines 11–20.

83. Doc. 51 Ex. D, Trial Transcript, Vol. 5, p. 20, lines 6–13.

84. *Id.* at p. 24 line 15 to p. 25 line 2.

85. *Id.* at p. 80 line 19 to p. 81 line 22.

86. Doc. 51 Ex. C, Trial Transcript, Vol. 8, p. 73, lines 15–25.

87. *Id.* at p. 72, lines 5–18.

88. *Id.*

89. Doc. 51 Ex. G, Mrs. Carr testimony at Trial Transcript, Vol. 8, p. 238, lines 5–20.

90. Doc. 51 Ex. D, Trial Transcript, Vol. 5, p. 87 lines 16–23.

fied that his ability to turn and reposition himself in bed was important because when he was wet, he could throw his dirty diaper on the floor and that was important in his ability to protect the integrity of his skin.[91]

As Nurse Frederick explained, patients who have a compromised ability to relieve pressure (*i.e.*, to turn and reposition themselves) are more vulnerable to developing pressure sores, and that one of the biggest risk factors for pressure sores is decreased mobility.[92]

The dislocated shoulder required Mr. Carr to be hospitalized and to have surgery.[93] When he came back to the nursing home he had to be immobilized. Nurse Frederick testified that Mr. Carr's mobility at this point decreased dramatically.[94] Dr. Mansfield similarly testified that after the shoulder dislocation, Mr. Carr's arm was tied up and he became a lot less mobile.[95] Dr. Mansfield also testified that after the dislocation, Mr. Carr was unable to do the kinds of things he used to do to move around in his bed and off-load himself, and that is when he started to develop contractures in his legs.[96]

The doctor further testified that after dislocating his shoulder, Mr. Carr was even more at risk for the development of pressure sores because his shoulder was tied up decreasing his mobility, and he developed contractures that did not allow him to move. Dr. Mansfield testified that Mr. Carr's contractures and malnutrition led to his pressure sores. Dr. Mansfield further testified that the nursing home's failures to provide turning and repositioning, adequate nutrition, and adequate hygiene proximately caused Mr. Carr to develop pressure sores.[97]

Dr. Mansfield testified that the significance of the nursing home's failures was that they led to the fact that Mr. Carr developed ulcers and because of their failures to feed him, to clean him, and to turn him and off-load him his ulcerations were subjected to further pressure.[98] Nurse Frederick likewise testified that the failure to turn and reposition Mr. Carr, the failure to provide a pressure reduction mattress, the failure to follow physician's orders, and the failure to keep him clean and dry led to the pressure sores.[99] Nurse Frederick also testified that the nursing home's treatment failures were ongoing, repeated and continuous.[100]

91. *Id.* at p. 91 lines 6–17.

92. *Id.* at p. 116 lines 12–17.

93. *Id.* at p. 59, line 23 to p. 60 line 2.

94. *Id.* at p. 80 line 19 to p. 81 line 22.

95. Doc. 51 Ex. C, Trial Transcript, Vol. 8, p. 72, line 22, to p. 73, line 8.

96. *Id.*

97. *Id.* at p. 73, lines 15–25, p. 102, p. 81, lines 10–14, & lines 6–19.

98. *Id.* at p. 126, lines 13–21.

99. Doc. 51 Ex. D, Trial Transcript, Vol. 5, p. 152, line 21 to p. 153, line 8.

100. *Id.* at p. 162 line 15 to p. 164 line 21. At trial, Mrs. Carr's lawyers also treated Mr. Carr's development of decubitus ulcers as one medical incident. In the opening statement given on behalf of Mrs. Carr, her counsel stated that Mr. Carr's dislocated shoulder "set in motion a chain reaction, a chain reaction that led to ... the loss of Raymond Carr's ability to turn and reposition himself in bed, the loss of his ability to wheel himself about the nursing home, and the loss, importantly, of the ability to be able, at night, to scoot over to the edge of the bed and to urinate on the floor, to be able to tear off the wet urine-soaked sheets and throw them off his body onto the floor." (*See* Exhibit "F," Trial Transcript, Vol. 3, p. 112, line 16 to p. 113, line 5). Counsel further stated that "the dislocation had costs [sic] him the ability to protect the integrity of his own skin from urine con-

In sum, CUIC's attempt to characterize the Underlying Suit as involving discrete injuries as a result of discrete acts and omissions is inconsistent with the evidence presented at trial. Rather, the evidence showed that the nursing home's treatment failures extended over time, were interrelated, and were causally connected to Mr. Carr's development of decubitus ulcers. Therefore, the treatment failures were all related and they formed a single malpractice claim. Accordingly, the adjudicated facts show that there was only one "medical incident" in this case, given the explicit language of the Royal Policies stating that "all *related* medical incidents arising out of the providing of or failure to provide professional health care services to any one person shall be considered one medical incident." [101] Similarly, there was at most one claim under the terms of Evanston's policy, to the extent that policy was triggered at all.[102] Because all of the "medical incidents" and/or "occurrences" in the underlying suit were *related*, this Court concludes that CUIC cannot stack the primary policies.

### E. "Erosion" Coverage

CUIC does not dispute that the HPL coverage part of Royal's policies provides only "erosion" coverage to the insureds.[103]

What CUIC does assert is that the CGL coverage part of the policies are ambiguous on the erosion issue and should therefore be construed in favor of coverage. As noted above, however, the CGL coverage parts of the Royal Policies were not triggered in the underlying suit. Accordingly, the Court finds that Royal is entitled to summary judgment on the erosion issue.

■ For the sake of completeness, the Court notes that even if the CGL coverage parts were triggered, the policies unambiguously provide that those parts also "erode" with respect to defense costs. Specifically, the CGL Coverage Part of the Royal Policies contains the following provisions:

**SUPPLEMENTARY PAYMENTS–COVERAGES A AND B**

We will pay with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

1. All expenses we incur.

.    .    .    .    .

5. All costs taxed against the insured in the "suit."

6. Prejudgment interest awarded against the insured on the part of the judgment we pay . . . .

7. All interest on the full amount of the judgment that accrues after entry of the

---

tact. . . . The evidence is going to show you that, before the dislocated shoulder, Mr. Carr, on a daily basis, was able to turn and reposition himself in bed." (*See* Exhibit "F," Trial Transcript, Vol. 3 p. 113 lines 6–13). Counsel further told the jury that "the loss of ability to reposition, the loss of ability to wheel around set the stage for the occurrence of contractures which began after the dislocated shoulder and for the occurrence of pressure sores which begin initially in December [1999]." (*See* Exhibit "F," Trial Transcript, Vol. 3 p. 115 line 23 to p. 116 line 4).

**101.** Royal Policies, Form PR 00 03 12 97, § III ¶ 3 (emphasis added).

**102.** As this Court noted above in discussing the CGL part of Royal's policies, the jury's malice finding indicates that Mr. Carr's injuries were not caused by an "accident." The Evanston Policy defines "occurrence" as "an *accident*, including continuous or repeated exposure to conditions, which results in personal injury or property damage neither expected nor intended from the standpoint of the Insured, arising out of the Named Insured's business as a hospital or nursing home." Doc. 45 Ex. 2 at p. 2 (emphasis added). Evanston, however, has not raised this issue.

**103.** *CUIC's Response to Royal's Motion for Summary Judgment* (Doc. 27) ¶ 38.

judgment and before we have paid, offered to pay, or deposited in the court the part of the judgment that is within the applicable limit of insurance.[104]

**SECTION III LIMITS OF INSURANCE**

5. ...[T]he Each Occurrence Limit is the most we will pay for the sum of:
a) Damages under COVERAGE A; and
b) Medical expenses under COVERAGE C; and
c) Supplementary Payments
because of all "bodily injury" and "property damage" arising out of any one "occurrence."[105]

Thus, attorney's fees, an expense incurred by Royal in the defense of the Nursing Home Defendants, as well as court costs, prejudgment interest, and post-judgment interest erode policy limits available to indemnify the insureds under any potentially applicable Royal policy. As a matter of law, CUIC is obligated to indemnify the insureds when the applicable Royal policy has been exhausted by the combined total of supplementary payments, which includes the aforementioned items, and damages up to policy limits.

## IV. CONCLUSION

In sum, the Court concludes that:
- Texas law applies to all relevant aspects of the Royal Policies in this action.
- There is no coverage under the CGL portion of any Royal primary policy.
- There is no coverage under any Royal policy for punitive damages assessed against any of the insureds in *Velma Carr, as an Heir at Law and the Representative of the Estate of Raymond Carr, Deceased vs. Health Care Holdings, L.L.C., et al*, Cause No.2001–54025, in the 152nd Judicial District Court of Harris County, Texas.
- The limits of the primary policies at issue in this lawsuit cannot be stacked. CUIC's obligations are triggered after the limits of one primary policy period have been exhausted.
- The limits of any applicable Royal primary policy are eroded by Supplementary Payments, which include fees and costs incurred in the defense of the Nursing Home Defendants, prejudgment interest, and post-judgment interest.

Accordingly, Royal's motion for partial summary judgment is GRANTED. The various pending motions seeking additional time and/or leave for filings (Docs. 26, 30 & 34) are also GRANTED. Any further pending motions are DENIED as moot.

---

**104.** Royal Policies, Form CG 00 01 01 96, § I.

**105.** First Royal Policy (Doc. 24 Ex. 3), End. 8; Second Royal Policy (Doc. 24 Ex. 4), Form RSA 1069.