**COLUMBIA CASUALTY COMPANY,**
**Appellant,**

v.

**CP NATIONAL, INC. and National**
**Emergency Services, Inc.,**
**Appellees.**

No. 01–00–01406–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Sept. 16, 2004.

Rehearing Overruled Sept. 15, 2004.

 

 

James M. Corbett, Giessel, Barker & Lyman, Inc., Houston, TX, William H. Briggs, Ross, Dixon & Bell, L.L.P., Washington, DC, for Appellant.

John E. Chapoton, Cunningham, Welsh, Darlow, Zook & Chapoton, LLP, Houston, TX, Jon Todd Powell, San Antonio, TX, for Appellees.

Panel consists of Justices NUCHIA, JENNINGS, and KEYES.

## OPINION ON DENIAL OF EN BANC RECONSIDERATION

EVELYN V. KEYES, Justice.

The court has considered appellees' motion for en banc reconsideration and is of the opinion that the motion should be denied. However, we withdraw our opinion and judgment dated May 27, 2004 and substitute those issued today to clarify our opinion.

This is an appeal from a summary judgment rendered in favor of appellees/plaintiffs, CP National, Inc. (CPN) and National Emergency Services, Inc, (NES) in a suit for breach of contract, breach of the duty of good faith and fair dealing, and declaratory judgment against appellant, Columbia Casualty Company (Columbia). In its sole point of error, Columbia contends that the trial court erred in rendering summary judgment on CPN's and NES's claim for declaratory judgment regarding Columbia's policy limits because the insurance policy provides a single "per loss event" limit. We reverse and render.

### Facts

#### NES's and CPN's Suit Against Columbia

NES is a physician practice management company. CPN is one of its affiliates that provides emergency room care physicians in the District of Columbia at Sibley Memorial Hospital. Drs. Richard Doyan and Cooper Pearce are employees of CPN who worked at Sibley. Columbia provided NES, its affiliates (including CPN), and physicians under contract with NES coverage under certain professional liability insurance policies against claims and suits arising out of alleged medical malpractice. The Policy at issue is a "Claims–Made Medical Practitioners Policy" that insured NES and its affiliates and subsidiary companies as "Named Insured"

against claims covered by the Policy and reported to the carrier, Columbia.

In 1998, Howard and Jill Flax filed a lawsuit in the Superior Court of the District of Columbia against Lucy Webb Hayes National Training School for Deaconesses and Missionaries d/b/a Sibley Memorial Hospital, CPN, Drs. Groover, Christie & Merritt, P.C., and Drs. Doyan and Newman. In an amended pleading, Jill Flax, individually and as personal representative of the deceased Howard Flax, added Dr. Pearce and NES as additional defendants. Pursuant to the Policy, Columbia defended NES, CPN, and Drs. Doyan and Pearce. A dispute arose, however, concerning the applicable limits of the Columbia Policy. Columbia claimed that the Policy expressly provided for a single "per loss event" limit of liability of $1,000,000. NES and CPN argued that the policy afforded a separate $1,000,000 limit each for claims against Dr. Doyan and Dr. Pearce, totaling $2,000,000.

NES and CPN filed a petition in Harris County District Court against Columbia, alleging breach of contract and breach of the duty of good faith and fair dealing, and seeking a declaratory judgment concerning the limits of the Policy. Each party moved for summary judgment. The trial court granted NES's and CPN's motion for partial summary judgment as it related to the declaratory judgment concerning the dispute over the monetary limits available to NES and CPN. After disposing of NES's, CPN's, and Columbia's other motions, the trial court entered a final judgment.

### The Underlying Suit

On the evening of December 1, 1996, Howard Flax sought treatment at Sibley emergency room complaining of persistent fever and a cough. Dr. Doyan, the emergency room physician on duty, examined Flax and, as part of the physical exam, ordered a chest x-ray. Dr. Doyan performed a preliminary reading of the x-ray and concluded that it was negative for pneumonia but that there was possibly a large lymph node. He diagnosed Flax as suffering from acute bronchitis and proscribed Hycomine and a Ventolin inhaler; he told Flax to continue taking the antibiotics he had been taking, and to take Tylenol or Advil if necessary.

The next day, Dr. Newman, a radiologist, interpreted the chest x-ray as "probably normal" and suggested a repeat x-ray in 30 to 60 days to exclude any growth in the left hilum, which contained very minimal fullness, probably representing vascular structures rather than pleural disease. He sent his report to the emergency room that day. Dr. Pearce was the emergency room physician on duty when the radiology report arrived at the emergency room. As the Director of the Emergency Department at Sibley, Dr. Pearce was responsible for reporting the x-ray interpretations from the radiologist to Flax and to his private physician. Dr. Pearce allegedly failed to inform Flax's private physician about the x-ray and failed to communicate to Flax that, although the x-ray looked normal, there was the possible presence of an abnormality and that a follow-up x-ray was recommended in 30 to 60 days.

Flax was later diagnosed as having peripheral T-cell lymphoma, which ultimately caused his death. The lymphoma was alleged to have been present on December 1, 1996, when he went to the Sibley emergency room. The Flaxes contended in their suit that Dr. Doyan misdiagnosed Flax's condition, misinterpreted the chest x-ray, and misrepresented to Flax that the results of his x-rays were normal. They also argued that Dr. Pearce was negligent in failing to inform Mr. Flax that he needed to obtain a follow-up chest x-ray because it would have detected the peripheral T-cell

lymphoma much earlier than it was ultimately detected. Overall, the *Flax* lawsuit alleged that "the defendants misinterpreted, mishandled, and miscommunicated the results of Mr. Flax's chest x-rays taken at Sibley Hospital on December 1, 1996. As a result ... the correct diagnosis and initiation of treatment for Mr. Flax's cancer was delayed for more than one year ... [This] delay was a substantial factor in eliminating or significantly reducing Mr. Flax's chance of surviving the disease." The first complaint included claims for medical negligence and loss of consortium against Dr. Doyan and CEP, but not against Dr. Pearce or NES. In her second amended complaint, Mrs. Flax added Dr. Pearce and NES as defendants and asserted additional claims for wrongful death and a survival action.

## Discussion

Columbia's sole issue on appeal is whether the trial court erred in rendering summary judgment for CPN and NES declaring that the Policy afforded a separate $1,000,000 limit each for Drs. Doyan and Pearce. Columbia contends that the insurance policy at issue provides only a single limit of liability in the amount of $1,000,000 for the claims arising out of the injury to Flax. CPN and NES, on the other hand, argue that the trial court did not err in granting a summary judgment in its favor and ruling that two separate limits of liability, in the total amount of $2,000,000, were available under the Policy for the claims made against Drs. Doyan and Pearce in the *Flax* lawsuit.

### Standard of Review

Summary judgment is proper only when a movant establishes that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995).

In reviewing a summary judgment, we indulge every reasonable inference in favor of the non-movant, assume that all evidence favorable to the non-movant is true, and resolve any doubts in its favor. *Id.*

### Construction of Insurance Contracts

 Insurance policies are contracts and therefore are controlled by rules of construction applicable to contracts generally. *Barnett v. Aetna Life Ins. Co.,* 723 S.W.2d 663, 665 (Tex.1987). When construing a contract, including an insurance policy, our primary focus is to ascertain the true intent of the parties as expressed in the written document. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995). Whether a policy or contract is ambiguous is a question of law for the court to determine. *Id.* A written contract that can be given a definite or certain legal meaning is not ambiguous. *Id.* If the policy or contract contains no ambiguity, the words used are to be given their ordinary meaning. *Puckett v. U.S. Fire Ins. Co.,* 678 S.W.2d 936, 938 (Tex.1984). If, however, the language of the policy or contract is subject to two or more reasonable interpretations, the policy is ambiguous and the construction that would afford coverage to the insured must be adopted. *Nat'l Union,* 907 S.W.2d at 520. A court should consider a contract, such as an insurance policy, as a whole, giving effect to each part; no single phrase, sentence, or section of the contract or policy should be isolated and considered apart from the other provisions. *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex.1994).

### The Policy

The issue on appeal is whether the Policy provides a single limit of liability of $1,000,000 for the claims made against Drs. Doyan and Pearce in the *Flax* lawsuit, as Columbia argues, or two separate

limits of liability, of $1,000,000 each, for a total of $2,000,000, for the claims made against Drs. Doyan and Pearce, as CPN and NES argue.

The dispute over the limits of the Policy arises primarily from two Policy provisions, Section III and Endorsement 12. Section III provides for the limits of liability for each claim:

The limit of liability stated for 'each claim' is the limit of our liability **for all injury or damage arising out of, or in connection with, the same or related medical incident.**

This limit shall apply separately to:

1. each individual specifically named in this policy who qualify [*sic* ] for coverage under the definition of you; and

2. to the Partnership, Association or Corporation specifically named as the named insured, collectively with such personnel included as you by occupational description, but not specifically named in this policy.

**This limit applies regardless of the number of persons or organizations who are covered under this policy.**

(Emphasis added.) "Claim" is defined as "the receipt by you of a demand for money or services, naming you and alleging a medical incident." "Claim" also "means a medical incident which you report to us during the policy period which might result in a claim." The limit of liability for "each claim" is "the limit of our liability for all injury or damage arising out of, or in connection with, the same or related medical incident." "Medical incident" is de-

fined as "any act, error, or omission in the providing of or failure to provide professional services by you."

Endorsement 12 of the Policy provides:

We agree with you,[1] that the professional liability limits shown on the policy Declarations page are amended to include the following:

$1,000,000 Per Loss Event (Indemnity & Expense)

$3,000,000 Any One Person Policy Aggregate (Indemnity and Expense)

The "Per Loss Event" limit applies to all Insureds for all Damages to all persons for injuries to one patient.

Endorsement 12 thus provides for a $1,000,000 Per Loss Event limit which applies to "all Insureds for all Damages to all persons for injuries to one patient."

### *"Loss Event"*

■■■■ As appellees point out in their motion for en banc consideration, the term "Per Loss Event" of Endorsement 12 is not defined in the Policy. Defining "per loss event" in the context of a medical malpractice insurance policy appears to be a matter of first impression for Texas. In insurance contracts generally, a "loss event" is the event that gives rise to the insurance company's liability under the contract. *See Helvering v. LeGierse,* 312 U.S. 531, 539, 61 S.Ct. 646, 85 L.Ed. 996 (1941); *AMERCO and Subsidiaries v. C.I.R.,* 96 T.C. 18, 38–39, 1991 WL 4981 (1991). Columbia, however, provided CPN and NES professional liability insurance

---

1. The Policy defines "You" or "Your" as (1) "the persons or organization named on the Declarations of this policy as the named insured; (2) any approved locum tenens employed by you while acting within the scope of their duties as such ...; (3) any physician or surgeon who becomes a partner, stockholder, or employee during the policy period ...; (4) any of your employees other than a physician or surgeon, but only while acting within the scope of their duties as such." Endorsement 5 to the Policy amended this definition to include "any physician or surgeon, but only for professional services provided on behalf of the organization named on the declarations of this policy as the Named Insured, and only at a location specified on the Schedule of Locations attached to this policy."

written on a claims-made basis. Under claims-made policies, versus occurrence policies, "the mere fact that an insured loss-causing event occurs during the policy period is not sufficient to trigger insurance coverage of the loss." *F.D.I.C. v. Mijalis,* 15 F.3d 1314, 1330 (5th Cir.1994). Rather, the insured generally must give notice to the insurer of any claims asserted against the insured, as well as of any occurrences that have caused or will potentially cause an insured loss. *Id.* The basic distinction between claims-made and occurrence policies is that, while the occurrence policy is triggered by the insured's liability-producing conduct, the claims-made policy is triggered by the presentation of a claim. *Continental Cas. Co. v. Maxwell,* 799 S.W.2d 882, 886 (W.D.Mo.1990).

■ Here, Columbia's liability is triggered when a claim is made. Section III defines a claim as the receipt of a demand for money or services that names the insured and alleges a medical incident, and it limits Columbia's liability for each claim for injury "arising out of, or in connection with the same or related medical incident." When Section III and Endorsement 12 are read together, the $1,000,000 "per loss event" limit is Columbia's limit of liability for each claim, which, Section III provides, is "the limit of our liability for all injury or damage arising out of, or in connection with, the same or related medical incident." [2]

### The "Loss Event" Limit

■ Columbia interprets Endorsement 12 literally. It contends that the "per loss event" limit of $1,000,000 "applies to *all Insureds* for *all Damages* to *all persons*

for injuries to *one patient.*" (Emphasis added.) Thus, because there is only one patient, there is only one $1,000,000 limit for any "loss event," *i.e.,* for any damages "arising out of, or in connection with, the same or related medical incident."

NES and CPN, on the other hand, ask us to interpret Endorsement 12 as limiting Columbia's $1,000,000 liability per loss event only with respect to all persons asserting claims for injuries to one patient, *i.e.,* with respect to derivative claims, but not as limiting Columbia's liability with respect to the *insureds* against whom the claims are asserted, *i.e.,* with respect to separate claims made against separate physicians. Accordingly, NES and CPN argue that "Endorsement 12 operates to bring within the first Per Loss Event limit all claims the Flaxes asserted against Doyan and within the second Per Loss Event limit all claims the Flaxes asserted against Pearce."

NES and CPN urge us to follow the reasoning in *Tumlinson v. St. Paul Insurance Company,* 786 S.W.2d 406 (Tex.App.-Houston [1st Dist.] 1990, writ denied), where we construed language of a policy that limited liability "for all claims resulting from the injury ... of any one person." In *Tumlinson,* we held that only one limit applied to separate claims filed by an injured child and its parents; thus, "the insurance company's liability is limited under the policy to $500,000 for the injury of the child, regardless of the economic injury to the parents resulting from the child's injury." *Id.* at 408. However, *Tumlinson* does not support NES's and CPN's position because it addressed *only* derivative claims; therefore, it does not preclude our

---

**2.** Our definition of per loss event as $1,000,000 for each claim for injury or damage arising out of, or in connection with, the same or related medical incident, is consistent with that used by CPN and NES. In their

original brief, CPN and NES defined the per loss event limit as "the $1 million limit for indemnity and cost of defense for each claim that asserts a medical incident."

finding that not only derivative claims, but also claims against different insureds with respect to the same patient are subject to a single 'per loss event' limit of liability.

While we agree with NES and CPN that Endorsement 12 limits derivative claims, we find that Endorsement 12 limits more than *only* derivative claims. Endorsement 12 is clear and unambiguous. Breaking down the sentence into its logical parts, the per loss event limit applies to *all insureds* (NES, CPN, Dr. Doyan, and Dr. Pearce) for *all Damages* (any damages sought in the *Flax* suit) to *all persons* (Mrs. Flax and the Flax estate) for injuries to *one patient* (Flax).

Although a literal interpretation of Endorsement 12 seems to focus heavily on the one patient aspect, it must be remembered that Endorsement 12 is limited by Section III and its limit of liability for injury arising out of, or in connection with "the same or related medical incident." Therefore, if one doctor committed an act of malpractice against a patient, and, six months later, the patient returned to the same hospital where a second doctor committed a second, *completely independent* act of malpractice on the same patient, there would *not* be one "loss event" despite there being only one patient; because the two doctors did not cause an injury arising out of, or in connection with, the "same or related medical incident," (the second doctor's act was completely independent) the insurance company's limit of liability would not be limited, and there would be two per loss event limits. This is not the case here, however, because, as will be discussed later, we find that the medical incidents forming the basis of the *Flax* lawsuit are related medical incidents.

NES's and CPN's interpretation of Endorsement 12 ignores the literal language of the Endorsement and requires us to read "all persons" restrictively and "all insureds" liberally, without any justification in the plain language of the Policy for interpreting these phrases differently. Moreover, if Endorsement 12 served to limit only derivative claims, as NES and CPN claim, there would be no limit as to any underlying claim because, as NES and CPN acknowledge, the $1,000,000 figure, limiting claims per loss event, is located in the Policy only in Endorsement 12. Furthermore, if we were to follow NES's and CPN's argument to its logical conclusion, Columbia's liability limits in the Policy would be meaningless. If, for example, 15 doctors, over the course of a week, examined, misinterpreted, mishandled, and miscommunicated the results of a patient's x-rays, all in slightly varying capacities, according to NES and CPN, 15 limits of liability in the amount of $15,000,000 would be available under the Policy for the claims made against the 15 doctors. We do not believe this is the intended result of Endorsement 12. Rather, the plain language of the policy limits the total recovery for "all injury or damage arising out of, or in connection with, the same or related medical incident" to $1,000,000, regardless of the number of insureds sued.

### Section III

Columbia argues that Section III of the Policy's Professional Liability Coverage offers further support for its interpretation of the Policy limits; NES and CPN disagree.

Columbia contends that, under Section III, claims arising out of "related medical incidents" are subject to a single limit of liability and, because the claims made by the *Flax* plaintiffs against Drs. Doyan and Pearce are related medical incidents, only one limit of liability applies. NES and CPN argue, in response, that the medical incidents alleged against Drs. Doyan and Pearce in the *Flax* lawsuit as separate

claims are not related because the doctors' actions were not causally related to one another; therefore, they are separate claims and are subject to the "limit of liability" stated for "each claim."

The question of defining "related" in a medical malpractice insurance policy appears to be one of first impression for Texas. The parties look to and provide supporting authority from other jurisdictions.

NES and CPN, rely primarily[3] on *Arizona Property & Casualty Insurance Guaranty Fund v. Helme,* 153 Ariz. 129, 735 P.2d 451 (1987), in which the Supreme Court of Arizona construed the term "related" to apply to the question of whether a causal relation existed between the acts or omissions of physicians treating patients. 735 P.2d at 455. While the *Helme* court recognized that "related," in its commonly accepted dictionary sense, means having a logical or causal connection, the court nevertheless refused to apply this definition and noted, "We do not believe that the word 'related' as used in the policy can be equated with the phrase 'logical connection.' ... Incidents may be 'logically related' for a wide variety of indefinable reasons. Causal connection depends, to a much greater extent, on objective facts in the record." *Id.* at 456. The *Helme* court,

therefore, required a causal connection between one physician's negligence and the second physician's negligence in order to find related medical incidents.

■■ Columbia relies heavily on *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Insurance Co.,* 5 Cal.4th 854, 21 Cal.Rptr.2d 691, 855 P.2d 1263 (1993). In that case, the California Supreme Court defined "related claims" as those encompassing "both logical and causal connections," noting that "restricting the word only to causal connections improperly limits the word to less than its general meaning." *Id.* at 1264; *see also Paradigm Ins. Co. v. P & C Ins. Sys., Inc.,* 747 So.2d 1040, 1042 (Fla.Dist.Ct. App.2000) (rejecting *Helme,* 735 P.2d at 451, and relying on *Bay Cities* in concluding that failure to notify excess insurance carrier was logically "related" act for purposes of notice provision of policy when both acts of negligence were said to have caused or contributed to absence of insurance coverage for loss). The Policy itself does not indicate that any particular definition, or a limited or restrictive definition, such as NES and CPN suggest, should be used to replace the plain, ordinary, and generally accepted meaning of "related."[4] *See W. Reserve Life Ins. v.*

3. NES and CPN suggest that we do not even need to address whether the claims made against the two doctors arose out of *related* medical incidents, because "medical incident" is defined in terms of a physician's services, not a patient, and therefore, because two doctors each provided their services and each committed alleged malpractice arising from his services, there must be two separate limits of liability. However, the fact that allegedly negligent services are provided by two different physicians does not entail that the acts are not logically related to each other, *i.e.,* do not arise out of a common nexus of logically connected events.

4. NES and CPN argue that if we determine that both parties have presented reasonable interpretations of Section III, ambiguous terms must be construed strictly against the insurer and liberally in favor of the insured, them. However, "not every difference in the interpretation of an insurance policy amounts to an ambiguity." *Potomac Ins. Co. of Illinois v. Jayhawk Med. Acceptance Corp.,* 198 F.3d 548, 551 n. 3 (5th Cir.2000). The mere absence of a policy definition does not give rise to a finding of ambiguity. *Id.* Similarly, although the insured and the insurer take conflicting views of coverage, neither conflicting expectations nor dialectics are sufficient to create ambiguity. *Forbau,* 876 S.W.2d 132, 134.

**348**

*Meadows,* 152 Tex. 559, 261 S.W.2d 554, 557 (1953). Moreover, although a malpractice event may involve numerous independent grounds of negligence that constitute a series of acts, Texas law indicates that they can still be related and form a single malpractice claim. *See Am. Physicians Ins. Exch. v. Garcia,* 876 S.W.2d 842, 853 n. 21 (Tex.1994) (comparing definition and ramifications of "Each Claim Occurrence" in commercial liability policy and medical malpractice policy; although "each claim occurrence" in medical malpractice policy has coverage effect similar to continuous or repeated exposure directive in commercial liability policy, malpractice event may involve independent malpractice grounds that cannot be classified as repeated exposure to same conditions but can constitute series of acts that are related). Thus, giving the term "related" its ordinary and generally accepted meaning, we conclude that "related" means having a logical or causal connection. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1050 (11th ed.2003).

Here, all the medical incidents involve the same patient, at the same facility, during the same period of time, with regard to the same x-ray. All of the acts of malpractice alleged against doctors Doyan and Pearce allegedly led to a single result that formed the basis of the *Flax* lawsuit—failure to apprise Flax of his lymphoma, leading to a delayed diagnosis and thus Flax's early death from lymphoma. We hold, therefore, that the medical incidents that form the basis of the *Flax* lawsuit are related medical incidents under the plain meaning of the Policy language.

We sustain Columbia's point of error.

### Conclusion

We hold that, as a matter of law, the plain language of the Policy at issue in this case limits total recovery to $1,000,000 for each loss event encompassing the same or related "medical incidents," including all claims made by any and all persons against any and all insureds in the *Flax* lawsuit. We reverse and render judgment that Columbia's total liability under the Policy is limited to $1,000,000.