**Opinion issued February 27, 2014**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00168-CV

————————————

**PAMELA LOMBANA, AS TRUSTEE OF THE FERNANDO LOMBANA INVESTMENT TRUST 10-6-98; PAMELA LOMBANA, AS TRUSTEE OF THE CHRISTINA ELISA LOMBANA TRUST AGENCY; PAMELA LOMBANA, AS TRUSTEE OF THE NATALIA ELIZABETH LOMBANA TRUST AGENCY; PAMELA LOMBANA, AS TRUSTEE OF THE NICHOLAS FERNANDO LOMBANA TRUST AGENCY, Appellant**

V.

**AIG AMERICAN GENERAL LIFE INSURANCE COMPANY, F/K/A THE OLD LINE LIFE INSURANCE COMPANY OF AMERICA, Appellee**

---

**On Appeal from the 270th District Court**
**Harris County, Texas**
**Trial Court Case No. 1026662**

---

# MEMORANDUM OPINION

Appellant, Pamela Lombana ("Lombana"), acting as the trustee of the Fernando Lombana Investment Trust 10-6-98, the Christina Elisa Lombana Trust Agency, the Natalia Elizabeth Lombana Trust Agency, and the Nicholas Fernando Lombana Trust Agency, challenges the trial court's rendition of summary judgment in favor of appellee, AIG American General Life Insurance Company, on her claims against AIG for breach of contract, breach of an oral or implied contract to reinstate, promissory estoppel, negligence, violations of the Texas Insurance Code,[1] violations of the Texas Deceptive Trade Practices Act ("DTPA"),[2] breach of the duty of good faith and fair dealing, fraud, and fraud by nondisclosure. In eleven issues, Lombana contends that the trial court erred in granting AIG summary judgment on her claims.

We affirm.

## Background

In October 1998, Dr. Fernando Lombana ("Dr. Lombana") created the Fernando Lombana Investment Trust 10-6-98 ("the Investment Trust"), which was to be funded by the proceeds of life insurance policies, including a $4 million AIG life insurance policy. Distributions from the Investment Trust were to be made to

---

[1] *See* TEX. INS. CODE ANN. §§ 541.060, 541.061, 542.055 (Vernon 2009).

[2] *See* TEX. BUS. & COM. CODE ANN. § 17.41–.926 (Vernon 2011 & Supp.2013).

three "Descendent Trusts" established for Dr. Lombana's children: the Christina Elisa Lombana Trust Agency, the Natalia Elizabeth Lombana Trust Agency, and the Nicholas Fernando Lombana Trust Agency. Dr. Lombana named his wife, Lombana, the trustee of the Investment Trust[3] as well as the Descendent Trusts.

The $4 million AIG life insurance policy, number MM0357292 ("the Policy"),[4] went into effect on January 28, 2003. It insured Dr. Lombana's life and named the Investment Trust as the "owner" and "primary beneficiary" of the Policy with Lombana, the trustee, as the "premium payor."

The Policy contained the following language pertinent to Lombana's claims:

PREMIUM PAYMENT

The first premium is due on the date of issue and is payable at our home office or to an authorized agent, insurance will not take effect before this premium is paid. Later premiums are due and payable at the intervals and for the period shown . . . while the insured is alive. Later premiums may be sent to our home office or given to an authorized agent in exchange for a receipt signed by one of our officers. With our consent, premiums may be paid at other intervals.

*Any premium, after the first, not paid on or before its due date will be in default. Each due date will be the date of default.*

. . . .

---

[3] Dr. Lombana and Lombana divorced after the Investment Trust was created, but Lombana remained the trustee.

[4] The Policy was originally issued by The Old Line Life Insurance Company of America, a predecessor in interest to AIG.

GRACE PERIOD

*A 31 day grace period, without interest charge, is allowed for the payment of each premium after the first.* This policy *will stay in force during this period. If the premium is not paid before the end of the grace period, insurance will end and this policy will lapse.*

. . . .

ELIGIBILITY

If your policy lapses, it may be *eligible for reinstatement if all of the following conditions are met*:

1. The policy has been in force continuously for at least five years immediately prior to the date of lapse;
2. All premiums have been paid in a timely manner during this period;
3. *The lapse results from an unintentional default in premium payments caused by the mental incapacity of the insured; and*
4. We receive a request for reinstatement and proof of the insured's mental incapacity within one year from the date of the lapse.

. . . .

PROOF AND REQUEST

To establish proof of the insured's mental incapacity, we must be provided with a clinical diagnosis by a physician licensed in Texas and qualified to make the diagnosis. We will accept the proof and request for reinstatement from:

1. you;
2. the insured, if you are not the insured;
3. the legal guardian of the insured;
4. other legal representative of the insured; or
5. the legal representative of the estate of the insured.

. . . .

MENTAL INCAPACITY

Mental incapacity means lacking the ability, based on reasonable medical judgment, to understand and appreciate the nature and consequences of a decision regarding failure to pay a premium when due and the ability to reach an informed decision in the matter.

. . . .

REINSTATEMENT

*We will reinstate an eligible policy within a period of one year after the date of lapse.* We will require payment of all unpaid premiums, plus 6% interest, from the date of lapse to the date of reinstatement.

1. Your policy will be treated as if it has been *in force* continuously since the lapse;
2. The policy provisions will apply as if there had been no lapse; and
3. You will be required to make any and all future premium payments required by the policy provisions to keep the policy in force.

. . . .

DEFINITIONS

Lapse – The due date of the last premium that remains unpaid after the expiration of the grace period defined in the policy.

. . . .

PAYMENT OF PROCEEDS

Proceeds will be payable on the date of the insured's death. *This policy will terminate on the earlier of (1) the date of the insured's death*, or (2) the final expiry date.

Upon receipt of due proof of the insured's death, we will pay the insured's beneficiary the face amount. We will add to the face amount any premium paid for the period beyond the policy month in which the insured's death occurs. If death occurs during the grace

5

period of an unpaid premium, an amount equal to one month's premium will be deducted from the proceeds.

Due proof of the insured's death will consist minimally of our company claim form completed by the beneficiary and a certified copy of the death certificate of the insured.

Interest as required by law will be added to the proceeds payable under this policy.

(Emphasis added.)

In October 2006, Dr. Lombana was diagnosed with rheumatoid arthritis, and his health deteriorated. Prior to the Policy's annual premium due date of April 28, 2008, AIG sent a billing notice to the Investment Trust at 414 Alkire Lake Drive, Sugarland, Texas 77478.[5] Lombana admits that this premium payment was not made. On May 18, 2008, AIG sent a payment reminder to the Investment Trust at the Alkire Lake address, but the U.S. Postal Service returned it to AIG, showing a change of address to "5307 Saint George Square Ln., Houston, Texas 77056." AIG then forwarded the payment reminder to the St. George address. No premium payment was made during the 31-day grace period provided by the Policy, and the

---

[5]     In 2004, Lombana had requested that her address as premium payor be changed from "414 Alkire Lake Drive, Sugarland, Texas 77478" to "2323 Wirt Road, Houston, Texas." In 2006, Dr. Lombana, as the insured, requested that his address also be changed from the Alkire Lake Drive address to the Wirt Road address. AIG continued to send correspondence to the Investment Trust to the Alkire Lake address until it was notified by the U.S. Postal Service of a change of address for the Investment Trust, after which it sent correspondence to the Wirt Road address.

6

Policy lapsed on the date of default, April 28, 2008. AIG then sent a Notice of Termination to the Investment Trust on June 27, 2008.

Summary-judgment evidence, consisting of Lombana's deposition testimony and AIG's telephone log notes reveal that, seven months later, on January 22, 2009, Lombana telephoned an AIG call center. Lombana testified that because the AIG representative told her that the Policy had lapsed in April 2008, she requested policy reinstatement forms and provided an address and fax number for AIG to send her the forms. Lombana explained that the AIG representative told her that she had to send AIG a premium payment of $7,017.20 when she received the forms. The AIG log notes reflect that the "PO," or "policy owner," requested that reinstatement forms be sent that day to a fax number, and AIG log notes from January 26, 2009 indicate that the reinstatement forms were sent via fax and mail, but no address or fax number is shown in the notes. An AIG representative testified that AIG had no fax confirmation and the notes should have indicated the number to which the fax had been sent. Lombana asserted that she did not receive any reinstatement forms, but concedes that she did not contact AIG again until after Dr. Lombana's death.

Dr. Lombana died on April 30, 2009, more than a year after the Policy had lapsed for non-payment of premiums. Representing Dr. Lombana's estate, JPMorgan Chase contacted AIG on August 24, 2009 to notify AIG of his death and

7

request certain forms related to his insurance policies. AIG, in a letter dated September 9, 2009, notified JPMorgan Chase that the Policy had terminated in 2008, and it enclosed copies of the Reminder of Payment Due and Notice of Termination.

Lombana subsequently filed the instant lawsuit and, on the same day, mailed three checks to AIG for the "reinstatement" of the Policy. In the memo line for the checks she noted, "Reinstatement of policy #MM0357292." In conformance with its standard practice, AIG deposited the checks into a "suspense account" and later, after determining that the Policy had terminated and the matter was in litigation, returned the funds to Lombana. AIG paid on four other life insurance policies, which were in force at the time of Dr. Lombana's death, totaling $7 million in death benefits.

In its summary-judgment motion, AIG challenged all of Lombana's claims. AIG asserted that, as a matter of law, Lombana did not have standing to sue and it was otherwise entitled to judgment in its favor on Lombana's claims for breach of contract, breach of an oral or implied contract to reinstate, violations of the Texas Insurance Code, violations of the DTPA, fraud, fraud by nondisclosure, and breach of the duty of good faith and fair dealing. AIG also asserted that Lombana had no evidence to support her claims for breach of contract, breach of an oral or implied contract to reinstate, promissory estoppel, violations of the Texas Insurance Code,

8

violations of the DTPA, breach of the duty of good faith and fair dealing, fraud, fraud by nondisclosure, and negligence.[6] After a hearing, the trial court granted AIG summary judgment without stating the reasons for its ruling.

## Standard of Review

We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). In conducting our review, we take as true all evidence favorable to the nonmovant, and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating*, 164 S.W.3d at 661; *Provident Life & Accident Ins.*, 128 S.W.3d at 215. If a trial court grants summary judgment without specifying the grounds for granting the motion, we must uphold the trial court's judgment if any of the asserted grounds are meritorious. *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 148 (Tex. App.— Houston [1st Dist.] 2005, pet. denied).

A party seeking summary judgment may combine in a single motion a request for summary judgment under the no-evidence standard with a request for summary judgment as a matter of law. *Binur v. Jacobo*, 135 S.W.3d 646, 650 (Tex. 2004). When a party has sought summary judgment on both grounds and the

---

[6] Lombana does not challenge the trial court's grant of summary judgment on her negligence claim.

9

trial court's order does not specify its reasons for granting summary judgment, we first review the propriety of the summary judgment under the no-evidence standard. *See* TEX. R. CIV. P. 166a(i); *see Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If we conclude that the trial court did not err in granting summary judgment under the no-evidence standard, we need not reach the issue of whether the trial court erred in granting summary judgment as a matter of law. *See Ford Motor Co.*, 135 S.W.3d at 600.

To prevail on a no-evidence summary-judgment motion, the movant must establish that there is no evidence to support an essential element of the nonmovant's claim on which the nonmovant would have the burden of proof at trial. *See* TEX. R. CIV. P. 166a(i); *Hahn v. Love*, 321 S.W.3d 517, 523–24 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The burden then shifts to the nonmovant to present evidence raising a genuine issue of material fact as to each of the elements challenged in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *Hahn*, 321 S.W.3d at 524.

In a matter-of-law summary-judgment motion, the movant has the burden to show that no genuine issue of material fact exists and the trial court should grant judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). A defendant moving for summary judgment as a matter of law must conclusively negate at least

10

one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). The motion must state the specific grounds relied upon for summary judgment. TEX. R. CIV. P. 166a(c).

## Standing

In her first issue, Lombana argues that the trial court erred in granting AIG summary judgment on the ground that she lacked standing and capacity to sue AIG because she is empowered by the Investment Trust and Texas law to take the necessary actions to wind up the trust and complete distribution to the beneficiaries after Dr. Lombana died and because she amended her petition to bring suit as representative of the Descendent Trusts. In its summary-judgment motion, AIG argued that Lombana, as a matter of law, did not have standing to sue AIG because the Investment Trust terminated per its terms upon Dr. Lombana's death and it could not have a justiciable interest in the outcome of the case. Lombana did initially sue AIG in her capacity as "trustee of the Fernando Lombana Investment Trust 10-6-98," but she later amended her petition to sue in her capacity as the trustee of the Descendant Trusts.[7]

We review the question of standing de novo. *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998). A party must have both standing

---

[7] We note that a trust is an entity that can sue and be sued only through its personal representative. *Ray Malooly Trust v. Juhl*, 186 S.W.3d 568, 570 (Tex. 2006).

11

and capacity to bring a lawsuit. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005). The focus in a standing issue is upon the question of whether the party bringing the lawsuit has a sufficient relationship with it so that there is a justiciable interest in the outcome. *Id.* Standing exists if the party bringing the lawsuit is personally aggrieved by the alleged wrong. *Nootsie, Ltd. v. Williamson Cnty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996). Capacity is procedural in nature, and the focus in a capacity inquiry is upon the personal qualifications of a party to litigate. *Id.* at 662. It is an issue that must be raised by a verified pleading or it is waived. *See* TEX. R. CIV. P. 93(1), (2). A party may lack standing because that party does not have a justiciable interest in the outcome of a case, but still have capacity when the party has the legal authority to act. *Nootsie*, 925 S.W.2d at 661.

AIG correctly notes that the Investment Trust terminated upon Dr. Lombana's death. *See* TEX. PROP. CODE ANN. § 112.052 (Vernon 2011); *Sorrel v. Sorrel*, 1 S.W.3d 867, 871 (Tex. App.—Corpus Christi 1999, no pet.). However, the property code allows a settlor to provide in the trust instrument how property may or may not be disposed of in the event of failure, termination, or revocation of the trust. *See* TEX. PROP. CODE ANN. § 112.053 (Vernon 2011). Here, the express terms of the Investment Trust state that "upon termination the remaining property of this trust shall be distributed . . . [t]he proceeds of all life insurance policies on

12

the Grantor's life . . . shall be distributed to the Trustee of the trust . . . to be administered and distributed to [the beneficiaries]."

The legal title held by the trustees and the equitable title held by the beneficiaries merged in the beneficiaries when Dr. Lombana died and the Investment Trust terminated. During the existence of a trust, legal title to the res is in the trustee and equitable title is in the beneficiaries. *Shearrer v. Holley*, 952 S.W.2d 74, 78 (Tex. App.—San Antonio 1997, no writ). Upon termination, legal and equitable interests merge and the beneficiaries acquire full ownership interest in the property. *See id*. However, trustees retain the powers necessary to wind up the affairs of the trust or to distribute the trust property in accordance with the terms of the trust. TEX. PROP. CODE ANN. § 112.052; *cf. Nowlin v. Frost Nat'l. Bank*, 908 S.W.2d 283, 289 (Tex. App.—Houston [1st Dist.] 1995, no writ); RESTATEMENT (SECOND) OF TRUSTS § 344 (1959).

Here, the Descendant Trusts are beneficiaries of the Investment Trust. AIG does not question that the Descendant Trusts have both standing and capacity in this lawsuit with Lombana acting as the legal representative of the Descendant Trusts. As beneficiaries of the Investment Trust, the Descendant Trusts each have a sufficient relationship with the lawsuit so that there is a justiciable interest in the outcome. *See Lovato*, 171 S.W.3d at 848. As trustee of each of the Descendant Trusts, Lombana has standing in this lawsuit. Accordingly, we hold that the trial

court erred in granting summary judgment for AIG on the ground that Lombana lacked standing.

We sustain Lombana's first issue.

## Breach of Contract

In her second issue, Lombana argues that the trial court erred in granting AIG summary judgment on her breach-of-contract claim because she presented evidence raising genuine issues of material fact precluding summary judgment. She asserts that the Policy was existing and in force at the time of Dr. Lombana's death and AIG breached the contract by failing and refusing to pay the Policy benefits and sending correspondence to the wrong address.

In its motion, AIG asserted that Lombana had no evidence of "a valid contract upon which [she] is basing this claim," "performance by [her] under the contract," or "breach of contract by [AIG]." AIG argued that because the payment of premiums was a "condition precedent to the establishment of liability of the insurer" and Lombana had failed to pay the premiums, the Policy had terminated prior to the death of Dr. Lombana. AIG also argued that, as a matter of law, it had not breached the contract by not sending the reinstatement correspondence to the correct address because no provision of the Policy required it to send such correspondence, and, regardless, it did not send the correspondence to the wrong address.

14

Insurance policies are contracts and are controlled by the same general rules that govern contract construction. *See Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex. 1987); *Columbia Cas. Co. v. CP Nat'l., Inc.*, 175 S.W.3d 339, 343 (Tex. App.—Houston [1st Dist.] 2004, no pet.). The elements of a valid contract are (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *See Prime Prods., Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). To establish a valid contract, a plaintiff must prove that the parties agreed on all of the essential terms of the contract and the essential terms were sufficiently certain so as to define the parties' legal obligations. *See Nickerson v. E.I.L. Instruments, Inc.*, 874 S.W.2d 936, 939 (Tex. App.—Houston [1st Dist.] 1994, writ denied). To establish a claim for breach of contract, a plaintiff must prove (1) the existence of a valid contract between the plaintiff and the defendant, (2) the plaintiff's performance or tender of performance, (3) the defendant's breach of the contract, and (4) the plaintiff's damages as a result of the breach. *See Prime Products*, 97 S.W.3d at 636.

When entered, on January 28, 2003, the Policy constituted a legal contract between AIG and Lombana as trustee of the Investment Trust. *See Columbia Cas. Co.*, 175 S.W.3d at 343. By its terms, the Policy required Lombana as trustee of

15

the Investment Trust and acting as premium payor to make premium payments at regular intervals. The Policy further provided in pertinent part as follows:

> [A]ny premium, after the first, not paid on or before its due date will be in default. Each due date will be the date of default. . . . A 31 day grace period . . . is allowed for the payment of each premium, after the first. This Policy will stay in force during this period. If the premium is not paid before the end of the grace period, insurance will end and this policy will lapse.

As a matter of law, the insurance provided by the Policy "end[ed]" and was not "in force" after the end of the grace period. *See MacIntire v. Armed Forces Benefit Ass'n*, 27 S.W.3d 85, 89 (Tex. App.—San Antonio 2000, no pet.) (stating that when grace period passes without payment of defaulted premium, insurance policy lapses and terminates); *P.M. Baker v. Penn. Mut. Life Ins. Co.*, 617 S.W.2d 814, 816 (Tex. Civ. App.—Houston [14th Dist.] 1981, no writ). Moreover, by its express terms, the lapsed Policy terminated upon the death of Dr. Lombana.

An insurance policy constitutes a contract for the period of time that is covered in the contract. *See Hartland v. Progressive Cnty. Mut. Ins. Co.*, 290 S.W.3d 318, 322 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *Zuniga v. Allstate Ins. Co.*, 693 S.W.2d 735, 738 (Tex. App.—San Antonio 1985, no writ); *Harrington v. Aetna Cas. & Sur. Co.*, 489 S.W.2d 171, 176 (Tex. App.—Waco 1972, writ. ref'd n.r.e.). Thus, the Policy insured Dr. Lombana's life only during the policy period. And, for an insurance contract to be renewed, the insurer's

renewal offer must be accepted by the insured completely and unequivocally. *Hartland*, 290 S.W.3d at 322.

It is well settled that the payment of premiums is a condition for acceptance of an insurance contract, necessary for contract formation. *See id.* Thus, under Texas law, the payment of premiums is a condition precedent to the existence of liability of the insurer. *See id.*; *Walker v. Federal Kemper Life Assur. Co.*, 828 S.W.2d 442, 449 (Tex. App.—San Antonio 1992, writ denied). If an insured fails to meet the condition of premium payment, the policy expires. *Southland Life Ins. Co. v. Hopkins*, 244 S.W. 989, 990 (Tex. Comm'n App. 1922, judgm't adopted) (holding that failure to pay premium "would ipso facto terminate all liability" under insurance policy); *Hartland*, 290 S.W.3d at 322; *Walker*, 828 S.W.2d at 447; *Zuniga*, 693 S.W.2d at 738. Here, Lombana presented no evidence that she paid the premium due on April 28, 2008 or at any time during the thirty-one day grace period that followed. In fact, Lombana admitted that she did not pay the premium and acknowledged that the Policy had lapsed for nonpayment of the premium as of April 28, 2008.

Because Lombana did not pay the Policy premium, the condition for acceptance of the contract was not met. *See Walker,* 828 S.W.2d at 447; *Viking Cnty. Mut. Ins. Co. v. Jones*, No. 05-91-01815-CV, 1992 WL 211068, at *3 (Tex. App.—Dallas Aug. 31, 1992, no writ) (mem. op., not designated for publication)

17

(offer by insurer to renew insurance contract must be accepted completely and unequivocally by insured to constitute new contract); *Zuniga*, 693 S.W.2d at 738 (renewal policy never came into existence because insured did not make payments in accordance with policy terms); *So. Farm Bureau Cas. Ins. Co. v. Davis*, 503 S.W.2d 373, 377 (Tex. App.—Amarillo 1973, writ ref'd n.r.e.) (offer for renewal of auto insurance could not come to fruition until premium was paid); *Trinity Universal Ins. Co. v. Rogers*, 215 S.W.2d 349, 352 (Tex. App.—Dallas 1948, no writ) (contract not completed when insured did not indicate acceptance of renewal policy). Thus, by its own terms, the Policy lapsed and the insurance "end[ed]" when Lombana failed to pay the premiums by the end of the thirty-one day grace period. *See Hopkins*, 244 S.W. at 990; *Hartland*, 290 S.W.3d at 322; *Walker*, 828 S.W.2d at 447; *Zuniga*, 693 S.W.2d at 738.

In sum, because Lombana failed to pay the requisite premiums as per the terms of the Policy, the Policy lapsed, the insurance ended, and the Policy terminated upon the death of Dr. Lombana on April 30, 2009. Dr. Lombana's life had not been insured since April 29, 2008, for just over twelve months prior to his date of death. Therefore, Lombana cannot establish an essential element of her breach of contract claim, i.e., the existence of a valid contract. Accordingly, we hold that the trial court did not err in granting AIG summary judgment on Lombana's claim for breach of contract.

18

We overrule Lombana's second issue.

## Waiver and Estoppel

In her fourth and fifth issues, Lombana argues that the trial court erred in granting AIG summary judgment on her claim for promissory estoppel because she presented evidence that "AIG made representations to her and remained silent on other matters [AIG] would later claim were necessary for reinstatement of a lapsed policy." Lombana further argues that AIG is estopped and has waived its argument that her non-payment of premiums caused the Policy to terminate because of AIG's "course of dealing of repeatedly sending late payment offers," by accepting her late payment of the Policy premiums in 2010 and keeping the payment for an extended period of time, and by violating the terms of the Policy including its "multiple failures to change the Policy contact information and send the reinstatement forms."

The elements of a claim for promissory estoppel are: (1) a promise; (2) foreseeability of reliance on the promise by the promisor; and (3) substantial detrimental reliance by the promisee. *Leach v. Conoco, Inc.*, 892 S.W.2d 954, 959 n. 2 (Tex. App.—Houston [1st Dist.] 1995, writ dism'd w.o.j.). Although promissory estoppel is normally pleaded as a defense, it may be asserted by a plaintiff, as here, as an affirmative ground for relief. *Fertic v. Spencer*, 247 S.W.3d 242, 250 (Tex. App.—El Paso 2007, pet. denied). If a valid contract exists

covering the alleged promise, a plaintiff cannot recover under promissory estoppel. *See id.*; *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 226 (Tex. 2002) (the doctrine of promissory estoppel presumes that no contract exists); *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) (allowing for no recovery under a quasi-contract or unjust enrichment theory where a valid express contract covers the disputed subject matter). Here, because a contract governed the terms under which AIG would pay insurance proceeds to the Investment Trust following Dr. Lombana's death, promissory estoppel does not apply.

"Waiver by custom and estoppel are the same concept." *MacIntire*, 27 S.W.3d at 89 (quoting *Blanton v. John Hancock Mut. Life Ins. Co.*, 345 F. Supp. 168, 170 (N.D. Tex. 1971), *aff'd per curium*, 463 F.2d 421 (5th Cir. 1972)). "Waiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). The elements of waiver are: (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right held or intentional conduct that is inconsistent with the right. *Id.*

Lombana further asserts that she presented "sufficient evidence of an agreement to waive requirements to reinstate other than the payments of the

premium" and she entered into an "agreement" with AIG on January 22, 2009 in which she was "reassured . . . that the Policy was still in force, and had no requirements other than payment of the reinstatement premium." In support of her position, Lombana relies on *Equitable Life Assurance Society v. Ellis*, 147 S.W. 1152 (Tex. 1912). She argues that she should not be held to any additional reinstatement requirements because the parties' "past dealing," along with the January 22, 2009 "agreement," eliminated any other requirements for reinstatement. Lombana asserts that to hold otherwise would be to "attach a condition that the proposal itself did not impose." *See Ellis*, 147 S.W. at 1157.

In *Ellis*, after the expiration of the grace period for the policy in question, the insured was involved in active and continuous back-and-forth written negotiations regarding the payment of premiums, changing the premium due dates, and discussing a loan using the policy as security so that the insured could pay the premiums. 147 S.W. at 1155–56. These negotiations were conducted by "a general officer of the company," the "superintendent of its extension and loan department" through the cashier of a local office, who had the requisite authority to so negotiate. *Id.* at 1153, 1155–56. The court concluded that the fact that the insurer was willing to offer the insured a loan on the policy showed that the insurer believed that the policy possessed value, noting "[i]t is unbelievable that this company would have been offering to make a loan and take as security for it

21

something that it recognized and held to be defunct and void and incapable of possessing any value." *Id.* at 1156. By acting as if the policy had value, the insurer showed that it "desired to be understood as willing to forego its right of forfeiture and continue the policies in force as security for its loan and as protection upon Ellis' life." *Id.* at 1157. In other words, the insurer acted as if the policy had "continued validity," and its negotiations with the insured evidenced a waiver of conditions of reinstatement that were contained in the policy itself. *Id.*

Lombana asserts that AIG waived termination of the Policy, even after the death of Dr. Lombana, noting that in *Ellis* the insurer had made an offer to the insured to reinstate the policy in question and the offer was still open at the time of his death. *Id.* at 1158 ("As the question of waiver is to be determined by the company's conduct and not by any failure by Ellis to act in the premises . . . that the transaction was not so completed by Ellis did not relieve its act of its force as an affirmative evidence of waiver, or at least as tending to establish it."). Lombana argues that because AIG never rescinded or withdrew the AIG call representative's January 22, 2009 "agreement" to reinstate the Policy, it was "still operative, despite [Dr. Lombana's] death, for a reasonable period." And she asserts that she raised a fact question as to whether she responded to AIG's waiver of additional requirements in a reasonable fashion based on AIG's failure to update the contact information, AIG's failure to forward the reinstatement forms to the Wirt Road

22

address and fax, and the fact that she was dealing with Dr. Lombana's final illness and death.

Here, however, the express terms of the Policy prohibit the type of "agreement" that Lombana asserts the AIG call representative made with her on January 22, 2009. The Policy expressly states that it "may not be changed, nor any of [AIG's] rights or requirements be waived, *except in writing by one of our authorized officers*." (Emphasis added.)

Moreover, AIG took no further action after it sent notification of termination of the Policy on June 27, 2008. There were no written communications with Dr. Lombana or with Lombana as trustee for the Investment Trust demonstrating that AIG believed that the Policy had "continued validity" or value. The summary-judgment evidence shows that when Lombana telephoned the AIG call center on January 22, 2009, she was told that she had to "reinstate" the Policy because it had lapsed seven months earlier on April 28, 2008. Lombana presented no evidence that AIG negotiated with her or treated the Policy as if it was still in force after Dr. Lombana had died.

Regardless, AIG could not have waived termination of the Policy after the death of its insured. *See MacIntire*, 27 S.W.3d at 90. Because the lapsed Policy had terminated when Dr. Lombana died, there was no contract to reinstate. *See id.*

23

Lombana further argues that the performance of the condition precedent of payment of premiums was excused because AIG prevented her performance by various actions. However, she presented no evidence that AIG prevented her performance. After her initial request on January 22, 2009 for forms to reinstate the lapsed Policy, she, despite asserting that she never received the forms, made no further request of AIG for the forms. And there is no evidence that AIG did anything to prevent Lombana from paying the Policy premiums to reinstate the Policy before the death of Dr. Lombana. In fact, she did not contact AIG again until after Dr. Lombana's death on April 30, 2009.

Lombana did not present evidence creating a question of material fact regarding her payment of premiums, any excused nonpayment, or waiver or estoppel based on negotiations with AIG demonstrating that AIG recognized the continued validity of the policy. Similarly, Lombana points to no evidence demonstrating that AIG actually in any way prevented her from paying the Policy premiums. Accordingly, we hold that the trial court did not err in granting AIG summary judgment on Lombana's claim for promissory estoppel.

We overrule Lombana's fourth and fifth issues.

**Breach of Oral or Implied Contract to Reinstate the Policy**

In her third issue, Lombana argues that the trial court erred in granting AIG summary judgment on her claims for breach of oral or implied contract to reinstate the Policy because she presented evidence to establish fact issues on these claims.

Lombana asserts that AIG entered into a new oral contract to reinstate the Policy during her January 22, 2009 telephone conversation with the AIG call center representative. However, she presented no evidence that the AIG call representative had any authority to enter into such an oral contract with her, nor did she present evidence of the parties' "mutual assent" or meeting of the minds. *See David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (stating that "[a] meeting of the minds is necessary to form a binding contract").

Moreover, according to Lombana's own testimony, she believed that she had to make a premium payment before the Policy would be reinstated. As previously discussed, Lombana provided no evidence that she made any such premium payment before the death of Dr. Lombana. Thus, even if Lombana and the AIG call representative had entered into an oral or implied contract to reinstate the Policy, Lombana did not perform her obligation under the oral contract to pay the Policy premium so that the Policy would be reinstated.

Accordingly, we hold the trial court did not err in granting AIG summary judgment on Lombana's claims for breach of an oral or implied contract to reinstate the policy.

We overrule Lombana's third issue.

**Texas Insurance Code and DTPA Violations**

In her sixth, seventh, eighth, and ninth issues, Lombana argues that the trial court erred in granting AIG summary judgment on her claims against AIG for violations of the Texas Insurance Code and the DTPA because she presented evidence that AIG failed to conduct a reasonable investigation into whether she entered into a contract to reinstate the Policy, the AIG call representative made affirmative representations and omitted material facts during the January 22, 2009 telephone call, and AIG failed to timely pay benefits due under the Policy.

Having concluded that the Policy had lapsed prior to, and had terminated upon, the death of Dr. Lombana, and Lombana provided no evidence that an oral or implied contract was entered into during her January 22, 2009 telephone call with the AIG call representative, we further conclude that there is no basis for Lombana's claims that AIG violated the Texas Insurance Code or the DTPA. *See Walker*, 828 S.W.2d at 453; *Shindler v. Mid–Continent Life Ins. Co.*, 768 S.W.2d 331, 334–35 (Tex. App.—Houston [14th Dist.] 1989, no writ). Accordingly, we

26

hold that the trial court did not err in granting AIG summary judgment on Lombana's claims that AIG violated the Texas Insurance Code and DTPA.

We overrule Lombana's sixth, seventh, eighth, and ninth issues.

## Good Faith and Fair Dealing

In her tenth issue, Lombana argues that the trial court erred in granting AIG summary judgment on her claim that AIG violated its common law duty of good faith and fair dealing because evidence of reinstatement of the Policy and her payment of premiums in 2010 made AIG's liability "reasonably clear."

Having concluded that the Policy had lapsed, the insurance had ended prior to the death of Dr. Lombana, and the Policy terminated upon his death, we further conclude that AIG did not breach a contractual duty to Lombana by denying her claim as the trustee of the Investment Trust, and, thus, AIG could not, as a matter of law, have acted in bad faith. *See Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995). Accordingly, we hold that the trial court did not err in granting AIG summary judgment on Lombana's claim that AIG violated the common law duty of good faith and fair dealing.

We overrule Lombana's tenth issue.

## Fraud and Fraud by Nondisclosure

In her eleventh issue, Lombana argues that the trial court erred in granting AIG summary judgment on her claim that AIG committed fraud or fraud by

nondisclosure because she presented evidence that AIG had "voluntarily disclosed" some information about reinstatement of the Policy to her, but failed to disclose additional requirements. She asserts that the parties had a "special relationship," requiring disclosure of "any additional requirements [AIG] would impose to reinstate" the Policy, and AIG had a duty to disclose "the whole truth concerning what it would require to reinstate the Policy." In its summary-judgment motion, AIG argued that Lombana's claim for fraud and fraud by nondisclosure failed as a matter of law due to a lack of justiciable reliance and because she provided no evidence of a material misrepresentation, made with knowledge of its falsity or without knowledge of the truth upon which AIG intended that she rely.

In order to recover on an action for fraud, a party must prove that: (1) a material representation was made; (2) the representation was false; (3) when the speaker made the representation, he knew it was false or made it recklessly without knowledge of the truth as a positive assertion; (4) the speaker made it with the intention that it should be acted upon by the party; (5) the party acted in reliance upon it; and (6) the party thereby suffered injury. *Soluntioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 385 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

Fraud by nondisclosure is a subcategory of fraud. *Id*. Failure to disclose information is actionable only when there is a duty to disclose. *Id*. The duty to

28

disclose may arise: (1) when the parties have a confidential or fiduciary relationship; (2) when one party voluntarily discloses information; (3) when one party makes a representation which gives rise to the duty to disclose new information that the party is aware makes the earlier representation misleading or untrue; or (4) when one party makes a partial disclosure and conveys a false impression, which gives rise to the duty to speak. *Id*. Whether such a duty exists is a question of law. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001).

In regard to Lombana's assertion that she had a "special relationship" with AIG that required disclosure of any additional requirements for reinstatement of the Policy, we note that an informal fiduciary relationship, which may arise from "a moral, social, domestic or purely personal relationship of trust and confidence," is generally called a "confidential relationship." *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998). A confidential relationship exists in cases in which "'influence has been acquired and abused, in which confidence has been reposed and betrayed.'" *Id*. (quoting *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992)). However, an insurer generally does not have a fiduciary relationship giving rise to a duty to an insured. *See Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 678–79 (Tex. App.—Fort Worth 2010, no pet.). Here, Lombana has presented no evidence that she had a confidential or fiduciary relationship with AIG.

29

Likewise, Lombana presented no evidence that the AIG call representative made a material misrepresentation during the January 22, 2009 telephone conversation with her with knowledge of its falsity, or that the AIG call representative made a misrepresentation with the intent that Lombana rely on it.

Accordingly, we hold that the trial court did not err in granting AIG summary judgment on Lombana's claim for fraud and fraudulent nondisclosure.

## Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Brown, and Huddle.

30